IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| REI HOLDINGS, LLC, a Utah limited liability company<br><br>Plaintiff,<br>v.<br><br>LIENCLEAR – 0001, LLC a Delaware limited liability company, BCMG, LLC, a Puerto Rico limited liability company, BLOXTRADE, LLC, a Puerto Rico limited liability company, LIENCLEAR, LLC, a Puerto Rico limited liability company, THOMAS MCOSKER, and DONALD BYRNE,<br><br>Defendants. | Civil Action No. _____<br><br>Jury Trial Demanded |

## COMPLAINT

Plaintiff REI Holdings, LLC ("REI" or "Plaintiff"), by and through undersigned counsel, brings this civil action against Defendants LienClear – 0001, LLC ("LienClear001"), LienClear, LLC ("LienClear"), BCMG, LLC ("BCMG"), BLOXTrade, LLC ("BLOXTrade"), Thomas McOsker ("McOsker"), and Donald Byrne ("Byrne") (collectively, "Defendants"). REI alleges as follows:

## INTRODUCTION

1. Plaintiff REI is in the business of purchasing tax liens from brokers (such as BCMG's subsidiary BLOXTrade), and then reselling those tax liens to investors who, in turn, monetize a tax lien by, among other ways, foreclosing on the property that is the subject of the lien, or by holding the tax lien and collecting the lien amount plus accrued interest when the tax lien is paid off by someone such as the property owner.

2. This is an action to remedy (a) the fraudulent inducement and subsequent breach of a Tax Lien Purchase and Sale Agreement pursuant to which REI purchased from BCMG and its

affiliates a tax lien portfolio held by a BCMG special purpose entity, LienClear001, comprised of tax liens issued by counties and municipalities in the State of Ohio, for approximately $1.9 million, and (b) the breach of certain servicing agreements by LienClear, BCMG's tax lien clearing house.

3. Defendants are a part of an elaborate enterprise of purchasing and securitizing tax lien assets in order to broker sales and sell tax lien portfolios to buyers throughout the United States and Puerto Rico, and to service the sale of these portfolios to buyers. The enterprise involves several business entities and individuals, and each is integral to the enterprise's success. BCMG is a firm specializing in investment banking for tax lien transactions by partnering with governments and municipalities to purchase their delinquent tax liens in bulk with the goal of securitizing, or pooling, the tax lien assets into portfolios to be re-sold for a profit. BLOXTrade is BCMG's brokerage arm, which touts itself as the world's largest tax lien brokerage firm. LienClear is BCMG's tax lien clearing platform, which handles the transferring of the tax lien assets on behalf of BCMG in all fifty states in the United States and Puerto Rico. LienClear001 is a special purpose entity formed to hold and transfer certain tax lien assets on behalf of BCMG and its affiliates and is the entity that is signed as the "seller" in connection with the agreements of sale. Upon information and belief, LienClear001 is one of several special purpose entities BCMG uses to sell tax lien assets to buyers, which it does to shield itself or limit its liability in connection with the tax lien sales. Individual defendants McOsker and Byrne are the managing members and owners of these business entities, and they are the ones who direct the activities of the business entity defendants.

4. Similar to the securitization of subprime mortgages into collateralized debt obligations that was a contributing factor in the subprime mortgage crisis, Defendants knowingly securitized, or pooled, worthless or significantly depressed assets to sell such assets with better

performing assets so that Defendants could realize a substantial return on their investment in connection with the worthless or depressed assets.

5. Many of the tax liens in the portfolio sold to REI by BCMG were defective in several respects and BCMG and its affiliate co-conspirators in the transaction knew of, and concealed, the defects from REI. As a result, the portfolio REI was duped into purchasing was worth significantly less than was represented to REI. Defendants intentionally misrepresented the value of the tax lien portfolio to REI in order to induce Plaintiff to purchase the portfolio at an inflated price. The co-conspirators of this fraudulent scheme are BCMG subsidiaries or affiliates and the individual owners who directed the actions of their business entities. As set forth herein, Defendants conspired to defraud REI so that they could offload bad assets for a profit. Each of the Defendants are integral to the scheme and, upon information and belief, they each profited from the scheme.

## THE PARTIES

6. REI is a Utah limited liability company with its principal place of business in the State of Utah.

7. BCMG is a Puerto Rico limited liability company with its principal places of business in the United States territory of Puerto Rico and the State of New York. Upon information and belief, the members of BCMG are McOsker and Byrne. Upon information and belief, BCMG is the parent and controlling entity of Defendants LienClear, BLOXTrade, and LienClear001. McOsker is the Chief Executive Officer of BCMG.

8. BLOXTrade is a Puerto Rico limited liability company with its principal place of business in the United States territory of Puerto Rico, and that transacts business with parties in

various states, including but not limited to the states of Ohio and Delaware. Upon information and belief, the members of BLOXTrade are McOsker and Byrne.

9. LienClear is a Puerto Rico limited liability company with its principal place of business in San Juan, Puerto Rico. Upon information and belief, BCMG is the sole member of LienClear.

10. LienClear001 is a Delaware limited liability company with its principal place of business in the State of New York. Upon information and belief, LienClear001 is a special purpose entity formed to hold and transfer certain tax lien assets on behalf of BCMG and its affiliates, including BLOXTrade, LienClear, McOsker and Byrne. Upon information and belief, BCMG is the sole member of LienClear001.

11. McOsker is an individual who, upon information and belief, resides in the United States territory of Puerto Rico. McOsker is the Chief Executive Officer of BCMG.

12. Byrne is an individual who, upon information and belief resides in the State of New York. Upon information and belief, Byrne is the Director of Operations of BCMG and is BLOXTrade's Director of Sales and Business Development for New York.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the adverse parties are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a). This action arises out of certain agreements between Plaintiff and Defendants LienClear001 and LienClear, and those agreements require any action to enforce or interpret the agreements, or arising out of or relating

to the agreements involving the parties thereto, be brought in a federal or state court of competent jurisdiction in Wilmington, Delaware.

## FACTS

A. <u>BCMG Approaches REI Regarding a Transaction, And the Parties Reach a Deal</u>

15. REI is in the business of purchasing portfolios of tax lien certificates issued by municipalities across the United States, and then reselling those tax lien certificates to investors.

16. In or around early November of 2015, Defendants McOsker and Byrne, on behalf of BCMG, approached REI regarding the purchase of a tax lien portfolio containing tax liens issued by certain municipalities and counties in the State of Ohio (the "Tax Liens").

17. McOsker told REI that foreclosure actions had been initiated for all of the Tax Liens and the process was near completion to acquire the properties. McOsker further assured REI that there was substantial value in the Tax Liens and the properties subject thereto.

18. On November 9, 2015, McOsker informed REI that the transfers of the Tax Liens and the acquisition of properties resulting therefrom, would be handled by Byrne at LienClear and Kristy Neff, a former employee of the State of Ohio who was working on behalf of LienClear to assist with the servicing of the Tax Liens.

19. On November 10, 2015, Vice President of Sales and Trading for BCMG, Nick Paidas, sent certain documents to REI at the request of McOsker. One of the documents sent was a spreadsheet listing over $7.3 million in tax liens. This spreadsheet contained the details for each of the Tax Liens.

20. This spreadsheet was modified before the parties entered into their final contract and REI ultimately purchased approximately 383 tax liens with a purported redemptive value of $1,893,437.07 and recoverable attorney's fees in the amount of $614,881.35.

21. When McOsker contacted REI about the Ohio tax lien transaction, McOsker represented that all of the attorneys' fees in connection with the underlying tax liens were incurred and paid, and that the attorney(s) working on the tax liens had completed the requisite work.

22. Based on the representations made by McOsker and BCMG personnel, REI agreed to purchase the Ohio tax lien portfolio, and it paid for the tax liens and the attorneys' fees incurred in connection therewith.

23. On December 22, 2015, LienClear001—a wholly-owned subsidiary of BCMG and the entity used by BCMG to effectuate the transaction—and REI entered into a Tax Lien Purchase and Sale Agreement (the "Sale Agreement") pursuant to which REI purchased the Tax Liens for $1,921,997.16, including brokerage, escrow and other transaction and servicer fees. A true and correct copy of the Sale Agreement is attached hereto as Exhibit A.

24. Pursuant to Section 4.01 of the Sale Agreement, LienClear001 represented and warranted that:

   a. LienClear001 owned the Tax Liens,

   b. LienClear001 held good and valid title to the Tax Liens,

   c. the Tax Liens would be transferred to REI free and clear,

   d. the Tax Liens were validly issued, and

   e. LienClear001 intended to convey legal title to all of the Tax Liens to REI.

Ex. A, Section 4.01.

25. Pursuant to Section 4.04, the parties agreed that they each would indemnify, and hold harmless, and, if requested by the other party in its sole and absolute discretion, defend the

other party from and against any and all Losses[1] to the extent arising out of or related to a breach of the Sale Agreement by such party, or any act or omission constituting gross negligence or willful misconduct on the part of such party, or any such party's breach of any applicable law.

26.  Schedule 1 to the Sale Agreement lists the tax lien assets sold to REI. Included on Schedule 1, among other things, is a representation of the redemption value, or RV, of each tax lien asset being sold. Defendants represented to REI that the total redemptive value of the Tax Liens was $2,508,318.42. This was knowingly false.

B.  REI Discovers Massive Problems With the Tax Liens

27.  As REI sold the Tax Liens to its customers after the transaction closed, REI began to learn that many of the Tax Liens sold to it were worthless, and others were worth far less than had been represented by LienClear, BCMG and McOsker.

28.  Certain of the Tax Liens covered properties on which the buildings had been completely demolished or condemned to be demolished without the possibility of reprieve. For example, the Tax Liens for Parcel Nos., 443-04-027 (two liens), 109-10-095 (two liens), 643-31-003 (three liens), 128-10-029 (two liens), 138-18-066 (three liens), 137-22-076 (three liens), 138-13-110 (one lien), 108-15-031 (one lien), 546-37-132 (one lien), 110-05-054 (one lien), 016-23-095 (two liens), 108-22-042 (two liens), 108-25-117 (two liens), 108-25-120 (two liens), 110-07-022 (two liens), 115-12-040 (two liens), 117-14-013 (two liens), 119-34-096 (three liens), 129-09-126 (one lien), 130-21-068 (three liens), 138-01-130 (two liens), 102-16-008 (two liens), 139-11-010 (two liens), and 782-24-003 (three liens) referenced in the Sale Agreement had been demolished or were condemned to be demolished, making the corresponding lien worthless.

---

[1] Section 1.01 defines "Losses" to mean "any claims, demands, actions, causes of action, judgments, damages, recoveries, fines, penalties, interest, liabilities, fees, costs, expenses and other losses, including reasonable attorneys' fees and court costs." Ex. A, Section 1.01.

29. Certain Tax Liens were non-transferable because they had been paid off by the property owner prior to the transfer of the lien to REI, or because the property was part of a bankruptcy action. For example, the Tax Liens on Parcel Nos. 016-23-095 (two liens), 130-13-112 (three liens), 139-09-020 (two liens), 117-22-001 (two liens) and 134-09-127 (two liens), referenced in the Sale Agreement had been paid off and there was no longer a valid lien on the property. Tax Liens on Parcel Nos. 137-22-088 (three liens), 015-23-085 (two liens), 105-27-132 (two liens), 106-22-092 (two liens), 107-12-132 (two liens), 108-06-047 (two liens), 108-21-109 (two liens), 108-25-117 (two liens), 109-24-062 (two liens), 110-28-032 (two liens), 111-11-112 (two liens), 112-03-022 (two liens) 114-31-006 (one lien), 125-14-027 (two liens), 127-22-001 (two liens), 128-26-118 (two liens), 129-09-126 (one lien), 129-25-051 (two liens), 130-13-112 (three liens), 133-04-028 (three liens), 134-22-074 (two liens), 136-01-031 (two liens) 137-17-015 (three liens), 137-21-057 (three liens), 141-07-074 (three liens), 786-02-836C (three liens), 511-07-028 (two liens), 110-05-054 (two liens), and 129-28-071 (two liens) referenced in the Sale Agreement were non-transferable due to bankruptcy status.

30. Certain Tax Liens sold to REI and detailed in the Sale Agreement had expired prior to the execution of the Sale Agreement and were therefore worthless at the time of the transaction because a tax lien foreclosure action had not been initiated within six (6) years of the sale of the tax lien, as required by Ohio Rev. Code § 5721.33(2). For example, the Tax Liens against Parcel Nos. 108-06-047 (two liens), 648-19-137 (one lien), and 127-15-097 (two liens) referenced in the Sale Agreement were expired at the time they were sold to REI.

31. Certain Tax Liens were being paid in installments by the property owner, whether by agreement or through bankruptcy payment plans that were subsequently dismissed, which presented a three-fold problem. First, because the lien amount had been reduced through payments

by the property owner, the actual value of the lien at the time of the execution of the Sale Agreement was significantly lower than had been represented by BCMG and LienClear in the Sale Agreement, which meant that REI overpaid for all such liens. Second, the payments being made by the property owner post execution of the Sale Agreement should have been paid to REI but were not. Third, the foreclosure action could not be completed where actual amounts due and owing by the property owner could not be proven. For example, the Tax Liens on Parcel Nos. 141-09-041 (two liens), 139-09-020 (two liens), 134-19-027 (three liens), and 134-22-074 (two liens) referenced in the Sale Agreement had been in repayment by the property owner with the Seller at the time of the transaction.

32. Certain Tax Liens were not properly handled by BCMG and/or LienClear prior to transfer to REI, and this fact was affirmatively misrepresented to REI. Prior to transfer to REI, McOsker represented to REI that certain attorneys' fees were incurred and paid in connection with the Tax Liens and that the attorneys competed their work. During the course of the negotiation of the Sale Agreement, McOsker told Brandon Neff, a principal at REI, that these attorneys' fees would be 100% collectible by REI. In reality, however, the attorneys did not finish their work. In fact, many foreclosure actions had been dismissed and new actions were required to foreclose on those Tax Liens. Based on this representation and the corresponding understanding that it would collect these fees as a component of the redemptive value of the Tax Liens, REI paid LienClear001 $614,881.35 in previously incurred attorneys' fees. Under relevant Ohio law, however, only $2,500 in attorneys' fees and costs are deemed to be presumptively reasonable, and therefore, a tax lien holder cannot collect any portion of attorneys' fees and costs charged in excess of this amount unless it has proof that all legal fees incurred were necessary. These attorneys' fees are identified in the Sale Agreement. All but 6 of the tax liens REI purchased had incurred more than

$2,500 in attorneys' fees prior to the sale. The only way REI could collect the $614,881.35 in fees and costs incurred by prior counsel would be for BCMG and its affiliates to provide the requisite proof that all of the legal fees were necessary. This was not disclosed to REI at the time of sale. When REI learned of this problem after closing on the purchase of the Tax Liens, REI requested the documentation from Defendants. Defendants never provided such documentation to REI and have refused to provide any documentation corroborating the need for the attorneys' fees paid by REI.

33. Further, after REI began to learn of the myriad of problems with the Tax Liens, REI was forced to engage additional legal counsel to attempt to address those problems prior to sale of the Tax Liens by REI to the end customer.

34. Certain Tax Liens were otherwise never transferred to REI. For example, Defendants never transferred the Tax Liens associated with Parcel Nos. 022-28-147 (two liens); 126-02-112 (four liens); 141-09-041 (two liens) 472-32-019 (four liens); 551-13-082 (two liens); 641-14-077 (three liens); 762-03-057 (two liens); and 901-31-010 (two liens).

35. Defendants knew that there were significant problems with the Tax Liens prior to the sale of the Tax Liens to REI. As the broker and holder of the liens prior to transfer, BCMG received notification from the relevant taxing authority, county or municipality regarding the status of the liens. In addition, with respect to the liens relating to properties on which the structure (dwelling, business, etc.) had been demolished, the county or municipality would have notified BCMG and McOsker about the demolition.

36. Discovery of problems with the Tax Liens is ongoing.

C.  **REI Informs McOsker that the Tax Liens are Riddled with Problems and McOsker, Despite Promises to Do So, Fails to Address the Problems**

37. Upon discovering the problems with the Tax Liens, REI contacted McOsker at BCMG. McOsker told REI that he would approach the seller and work out a refund for the problematic liens. McOsker once again promised REI that REI would get its attorney's fee back that it had paid for at the time of the purchase of the Tax Liens.

38. McOsker, on behalf of LienClear and BCMG, claiming the seller of the liens was unable to provide a refund for the problematic liens, offered to transfer to REI additional tax liens owned by Defendants. McOsker stated that Defendants did not have the money to refund the liens.

39. On or about October 25, 2016, LienClear proposed to enter into a second Tax Lien Purchase and Sale Agreement (the "Proposed Replacement Lien Agreement") pursuant to which LienClear would provide to REI additional, replacement tax liens for the Tax Liens that were problematic ("Replacement Tax Liens"). A true and correct copy of the Proposed Replacement Lien Agreement is attached hereto as Exhibit B.

40. REI would not be transferring problematic liens back to LienClear under the Proposed Replacement Lien Agreement. LienClear did not want to re-assume ownership of those liens.

41. REI researched the proposed Replacement Tax Liens and discovered that the Replacement Tax Liens were riddled with the same types of problems as the original Tax Liens.

42. The Proposed Replacement Lien Agreement was never executed, as REI did not want to assume ownership of additional tax liens that would cause the same problems REI was facing with the Sale Agreement. McOsker continually assured REI that he would remedy all problems and "make it right" with REI.

43. Ultimately, however, McOsker told REI that REI would have to sue Defendants to obtain any recovery against Defendants.

D. **LienClear Acted as Servicer Under the Servicing Agreement, and LienClear Breached that Agreements as Well**

44. In connection with the Sale Agreement, REI and LienClear executed a separate Servicing Agreement (the "Servicing Agreement"). A true and correct copy of the Servicing Agreement is attached hereto as Exhibit C.

45. As servicer, LienClear was engaged to perform the transfer and assignment of the Tax Liens from LienClear to REI.

46. Pursuant to the Servicing Agreement, LienClear was obligated to perform certain tasks with respect to the transfer of the Tax Liens from LienClear to REI. Those tasks are defined as "services" ("Services") in the Servicing Agreement, and included the obligation to review each of the Tax Liens "to determine whether any of the Tax Liens are untransferable due to a redemption or for any other reason[.]" Ex. C, Schedule 1. LienClear was also obligated to "effectuate the assignment of each such Tax Lien to [REI]." *Id.*

47. Importantly, LienClear was required to "promptly notify [REI] of any defects, deficiencies or other issues that impede or preclude [LienClear] from providing any or all of the Services. [LienClear] represents that it has investigated the conditions necessary to provide the Services and assumes the liabilities and risks related thereto." Ex. C, Section 4.

48. Under the Servicing Agreement, LienClear covenanted and warranted to (among other things): (1) employ its best skill, efforts and judgment in performing the Services (as defined in the Servicing Agreement) under the Servicing Agreement, (2) utilize efficient business administration and supervision, and (3) perform the Services in a timely, professional and ethical manner. *Id.*

49. Pursuant to Section 9 of the Servicing Agreement, LienClear agreed to indemnify and hold harmless REI from any and all claims, damages, fees, costs, expenses, attorneys' fees and court costs that arise out of LienClear's performance under the Servicing Agreement, its breach of any representation, warranty or covenant under the Servicing Agreement, or LienClear's negligence or misconduct. Ex. C, Section 9.

50. REI paid LienClear $78,055.06 under the Servicing Agreement.

51. Upon information and belief, LienClear failed to review any of the Tax Liens to determine if any were not able to be transferred.

52. Upon information and belief, LienClear failed to review any of the Tax Liens to determine if there were defects, deficiencies or other issues that impeded or precluded LienClear from providing any or all of the Services under the Servicing Agreement.

53. If LienClear did review any of the Tax Liens to determine if any were not able to be transferred, or if any suffered from defects, deficiencies or other issues that impeded or precluded LienClear from providing the Services it was obligated to provide under the Servicing Agreement, LienClear intentionally did not inform REI that any Tax Liens were defective.

54. The Servicing Agreement contains a prevailing party fee-shifting provision. Ex. C, Section 14.

## COUNT I
**(Fraud in the Inducement)**

55. REI hereby re-alleges the preceding paragraphs of this Complaint as if set forth in full herein.

56. Defendants knew that the value of the Tax Liens was significantly less than was represented to REI at the time the Sale Agreement was executed.

13

57. Defendants knew that the Tax Liens suffered from a variety of defects that made many of the liens worthless, or worth significantly less than Defendants represented to REI.

58. Defendants intentionally concealed the defects in the Tax Liens to induce REI into entering into the Sale Agreement.

59. Defendants knew or should have known that REI would rely on information actually provided to REI in making its decision to purchase the Tax Liens.

60. Defendants intended for REI to overpay for the Tax Liens.

61. Defendants conspired to represent to REI that the Tax Liens would generate significant profits to REI.

62. REI actually and justifiably relied on the representations by Defendants, and REI would not have purchased the Tax Liens but for the actions and representations of the Defendants.

63. As a result of Defendants' actions, REI has been damaged in an amount to be determined at trial.

64. Defendants acted egregiously, intentionally and with reckless and wanton disregard for the rights of REI.

65. Accordingly, Defendants are entitled to punitive damages in an amount to be determined at trial.

## COUNT II
### (Breach of Contract Against LienClear001 – Sale Agreement)

66. REI hereby re-alleges the preceding paragraphs of this Complaint as if set forth in full herein.

67. Through the Sale Agreement, LienClear agreed to sell, and REI agreed to buy, the Tax Liens.

68. In connection with the sale of the Tax Liens, pursuant to Section 4.01 of the Sale Agreement, LienClear represented and warranted that (a) it owned and held title to the Tax Liens, (b) the Tax Liens would be transferred to REI free and clear, (c) the Tax Liens were validly issued, and (d) legal title to the Tax Liens would be passed to REI.

69. As set forth herein, LienClear breached Section 4.01 of the Sale Agreement by selling to REI defective Tax Liens.

70. REI is therefore entitled to recover from LienClear all damages it has sustained as a result of LienClear's breach of the Sale Agreement, in amount to be proven at trial.

71. REI is further entitled to recover its attorneys' fees and costs pursuant to Section 4.04 of the Sale Agreement.

## COUNT III
**(Breach of Contract Against LienClear – Servicing Agreement)**

72. REI hereby re-alleges the preceding paragraphs of this Complaint as if set forth in full herein.

73. Pursuant to the Servicing Agreement, LienClear was obligated to (a) review each of the Tax Liens to determine if any were untransferable, (b) effectuate the assignment of each Tax Lien to REI, and (c) promptly notify REI of any defects, deficiencies or other issues with the Tax Liens.

74. LienClear breached these obligations under the Servicing Agreement.

75. REI is therefore entitled to recover from LienClear all damages it has sustained as a result of LienClear's breach of the Servicing Agreement, in amount to be proven at trial.

## COUNT IV
### (Civil Conspiracy)

76. REI hereby re-alleges the preceding paragraphs of this Complaint as if set forth in full herein.

77. Defendants conspired together to offload for a profit to REI certain tax lien assets that were worthless, unmarketable or significantly depressed in value.

78. The conspiracy benefitted Defendants, and each of them, and harmed REI in that REI did not receive the value of the Tax Liens for which it bargained.

79. Defendants intentionally concealed the values (or lack thereof) of certain of the Tax Liens sold to REI. Defendants knowingly misrepresented the redemptive value of the Tax Liens to be substantially greater than their true value.

80. Defendants acted together as a confederation and committed the unlawful acts described herein, which caused damages.

## COUNT V
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

81. REI hereby re-alleges the preceding paragraphs of this Complaint as if set forth in full herein.

82. To the extent the express provisions of the Sale Agreement and/or Servicing Agreement do not address LienClear001's conduct, LienClear001 breached the implied covenant of good faith and fair dealing.

83. At the time of the sale of the Tax Liens and the execution of the Sale Agreement and the Servicing Agreement, REI had a reasonable expectation that LienClear001would be providing Tax Liens with redemptive values in excess of the purchase price and that the attorneys' fees paid by REI were in fact collectible by the holders of the Tax Liens.

84. If REI had known that the attorneys' fees were not collectible without additional documentation from the seller, then REI either would have demanded that documentation prior to closing or would have paid a maximum of $2,500 per tax lien. Similarly, if REI had known that the Tax Liens were not collectible and the redemptive values were less than the purchase price, then REI would have negotiated a lower price. If such negotiations had not been successful, then REI would not have executed the Sale Agreement or the Servicing Agreement, and would not have purchased the Tax Liens.

85. As a direct and proximate result of LienClear001's breach of the implied covenant of good faith and fair dealing, REI has been damaged in an amount to be determined at trial.

## COUNT VI
### (Unjust Enrichment)

86. REI hereby re-alleges the preceding paragraphs of this Complaint as if set forth in full herein.

87. REI paid LienClear in excess of $1.9 million for the defective Tax Liens.

88. LienClear accepted the payment from REI while simultaneously knowing that the Tax Liens were defective in a myriad of ways.

89. Defendants are the direct or indirect recipients of the benefits and enrichment flowing from the misconduct by Defendants described herein.

90. By selling to REI the defective Tax Liens, Defendants have been unfairly enriched and REI has suffered severe harm and has been impoverished.

91. It would be unconscionable for Defendants to be permitted to retain these benefits that were derived by improper and unlawful means, and without justification.

92. REI has no adequate remedy at law, and, accordingly, this Court should award to REI an amount sufficient to eliminate Defendants' unjust enrichment.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court grant enter judgment in Plaintiff's favor and against Defendants, as follows:

    A.    Awarding Plaintiff compensatory damages in amount to be proven at trial.

    B.    Awarding Plaintiff punitive damages in an amount to be determined at trial.

    C.    Awarding Plaintiff pre- and post-judgment interest, plus costs and expenses, including reasonable attorneys' fees.

    D.    Granting such other and further relief as the Court may deem just, equitable and proper.

Dated: September 10, 2018        **CHIPMAN BROWN CICERO & COLE, LLP**

                              */s/ Gregory E. Stuhlman*
                              Joseph B. Cicero (#4388)
                              Gregory E. Stuhlman (#4765)
                              Stephanie H. Dallaire (#5184)
                              Hercules Plaza
                              1313 North Market Street, Suite 5400
                              Wilmington, DE 19801
                              (302) 295-0191

                              *Attorneys for Plaintiff*