IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| REI HOLDINGS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 18-1401 (MN) |
| | ) | |
| LIENCLEAR – 0001, LIENCLEAR – 0002, | ) | |
| LLC, BCMG, LLC, LIENCLEAR, LLC, | ) | |
| THOMAS MCOSKER, DONALD BYRNE, | ) | |
| BFNH, LLC, DAN FRIEDMAN and | ) | |
| OPTIMUM ASSET MANAGEMENT, | ) | |
| | ) | |
| Defendants. | ) | |

## **<u>MEMORANDUM OPINION</u>**

Joseph B. Cicero, Gregory E. Stuhlman, CHIPMAN BROWN CICERO & COLE, LLP, Wilmington, DE – Attorneys for Plaintiff.

Blake A. Bennett, Dean R. Roland, COOCH AND TAYLOR, P.A., Wilmington, DE – Attorneys for Defendants.

November 6, 2020
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE**:

On December 20, 2020, Plaintiff REI Holdings, LLC ("REI" or "Plaintiff") filed its Amended Consolidated Complaint (D.I. 36) ("ACC") against Defendants LienClear – 0001, LLC ("LienClear0001"),[1] LienClear – 0002, LLC ("LienClear0002"), LienClear, LLC ("LienClear"), BCMG, LLC ("BCMG"), Thomas McOsker ("McOsker"), Donald Byrne ("Byrne"), and BFNH, LLC ("BFNH") (collectively, "Moving Defendants"), Dan Friedman ("Friedman"), and Optimum Asset Management, LLC ("Optimum") (collectively, with the Moving Defendants, "Defendants") Before the Court is Moving Defendants' motion (D.I. 42) to dismiss Counts I, IV, VIII, and IX of the ACC for failure to state a claim.  For the reasons set forth below, Defendants' motion to dismiss the Amended Consolidated Complaint will be GRANTED-IN-PART and DENIED-IN-PART.

## I.      **BACKGROUND**[2]

REI is in the business of purchasing and reselling tax lien portfolios.  (D.I. 36 ¶ 1). Defendants are limited liability companies and individuals engaged in the business of buying and selling tax liens (*id.* ¶¶ 6–13) who allegedly "knowingly securitized, or pooled, worthless or significantly depressed assets to sell such assets with better performing assets so that Defendants could realize a substantial return on their investment in connection with the worthless or depressed assets" (*id.* ¶ 16).

---

[1]      In the briefing, parties refer to Defendant LienClear – 0001, LLC both as "LienClear0001" and "LienClear001."  The Court generally will use "LienClear0001," though "LienClear001" may be used when quoting from the briefing.

[2]      The facts recited are those alleged by Plaintiff, which the Court must, at this stage, take as true.

A.    **Ohio Tax Liens**

In November of 2015, McOsker and Byrne, on behalf of BCMG, approached REI about purchasing a portfolio of Ohio tax liens ("the Ohio Liens").  (*Id.* ¶ 24).  McOsker informed Plaintiff that foreclosure actions had been commenced for all the Tax Liens and assured Plaintiff "that there was substantial value in the Ohio Liens and the properties subject thereto."  (*Id.* ¶ 25).  "On November 9, 2015, McOsker informed REI that the transfers of the Ohio Liens and the acquisition of properties resulting therefrom, would be handled by Byrne at LienClear" and another person.  (*Id.* ¶ 26).  The next day, a vice president for BCMG shared a spreadsheet with Plaintiff detailing certain tax liens.  (*Id.* ¶ 27).  This spreadsheet was later modified to identify "approximately 383 [Ohio Liens] with a claimed redemptive value of $1,893,437.07 and recoverable attorney's fees in the amount of $614,881.35."  (*Id.* ¶ 28).  On December 22, 2015, LienClear0001 and REI entered into a Tax Lien Purchase and Sale Agreement ("the Ohio (LienClear0001) Agreement").  (*Id.* ¶ 31, Ex. B).  Under the Ohio (LienClear0001) Agreement, Plaintiff purchased the Ohio Liens for $1,921,997.16, which included the costs of brokerage, escrow, and other transaction and service fees.  (*Id.*).  The Ohio (LienClear0001) Agreement states, in pertinent part:

> The Tax Lien Purchase Agreement (this "Agreement") is made as of 12-22-2015 (the "Effective Date") by and among LienClear – 0001, LLC (the "Seller") and REI Holdings (the "Buyer").
>
> *      *      *
>
> Section 4.01. Seller's Limited Representations. Seller hereby represents and warrants that:
> (a) the Seller, it's [sic] affiliated subsidiary, or its wholly owned subsidiary is the owner of the Tax Liens, with good and valid title thereto, and with full right to sell and transfer the same;
> (b) the Seller has the authority to sell the Tax Liens to Buyer;
> (c) the Tax Liens will be transferred to Buyer free and clear of all encumbrances;
> (d) to the Seller's knowledge the Tax Liens are validly issued under Applicable Law;

(e) once the Purchase Price has been paid by the Buyer and delivered to the Seller in accordance with the terms hereof, the Seller shall have no further rights or claims to the Tax Liens;

(f) the Seller intends to convey to the Buyer legal title to all of the Tax Liens;

(g) Seller has the full right, power and authority, without the consent of any other persons, to execute and deliver this Agreement and to perform its obligations under this Agreement and the transactions on its part contemplated hereby.

Except as expressly set forth above, Seller makes no representations or warranties with respect to the Tax Liens or any other matters.

Section 4.02. <u>Buyer's Limited Representations.</u>   Buyer hereby represents and warrants that as of the date hereof:

(a) Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the state of its formation.

(b) Buyer has full power and authority to enter into and perform this Agreement and to purchase the Tax Liens from Seller;

(c) This Agreement has been duly executed by the Buyer and delivered to the Sellers and constitutes a legally valid and binding obligation of the Buyer, enforceable against the Buyer in accordance with its terms, except as limited by bankruptcy an laws affecting the enforcement of creditors' right generally and equitable principles; and

(d) the Buyer is a sophisticated party that understands the Tax Liens, its investment in the Tax Liens and the risks associated therewith.

Except as expressly set forth above, Buyer makes no representations or warranties.

\*   \*   \*

Section 5.07. <u>Merger and Integration</u>. This agreement contains all of the terms and conditions relating to its subject matter to which the parties have agreed. All prior understandings of any kind are superseded by this Agreement.

(D.I. 36, Ex. B).  Attached to the Ohio (LienClear0001) Agreement, as Schedule 1, was a chart listing each of the 383 Ohio Liens and a representation of the redemptive value thereof.  (D.I. 36 ¶ 36).  The total redemptive value of the Ohio Liens in Schedule 1 was $2,508,318.42.  (D.I. 13 ¶ 36).

REI, LienClear, and LienClear0001 also executed a Servicing Agreement ("the Ohio Servicing Agreement").  (D.I. 36, Ex. D).  The Ohio Servicing Agreement states, in pertinent part:

> **THIS SERVICES AGREEMENT** (this "Agreement") is made this 12-22-2015 ("Date"), by and among LienClear – 00001, LLC (the "Seller"), REI Holdings (the "Buyer") LienClear, LLC ("Servicer").
>
> \*    \*    \*
>
> 1. **Services**. Servicer shall provide the services to Buyer and Seller as set forth on Exhibit A hereto (the "Services") in accordance with the Agreement.
>
> \*    \*    \*
>
> 4. **Servicer's Covenants**. Servicer accepts the relationship of trust and confidence established by this Agreement and covenants and warrants as follows: . . .
>
> c. Servicer shall, in performing the Services, comply with all applicable federal, state and local laws, ordinances, regulations and orders (collectively, " Laws"[sic]). . . .
> e. Servicer promptly shall notify the Company of any defects, deficiencies or other issues that impede or preclude Servicer from providing any or all of the Services. Servicer represents that it has investigated the conditions necessary to provide the Services and assumes the liabilities and risks related thereto.
>
> \*    \*    \*
>
> **SCHEDULE 1**
> **TAX LIENS**
> {Attached}
> **EXHIBIT A**
>
> **Services**
> Servicer shall take all actions and execute and deliver, or oversee the execution and delivery of, all documents and certificates necessary to effectuate the transfer of ownership of the Tax Liens (except for Excluded Tax Liens (as defined herein)) from Seller to Buyer, including without limitation:
>
> 1. Review the list of Tax Liens to determine whether any of the Tax Liens are untransferable due to a redemption or for any other reason

(such untransferable Tax Liens are referred to herein as the
"Excluded Tax Liens").

                                *    *    *

5. Take such other actions as reasonably requested by Buyer or
Seller to further effectuate the completion of the Transaction.

(*Id.*).  Following the execution of the agreements, REI began to sell the Ohio Liens to its customers.

(D.I. 36 ¶ 39).  At that point, "REI began to learn that many of the [Ohio Liens] sold to it were

worthless, and others were worth far less than had been represented by LienClear, LienClear0001,

BCMG and McOsker."  (*Id.*).  Plaintiff alleges that: (1) certain of the Ohio Liens covered properties

on which the buildings had been demolished or condemned to be demolished; (2) liens had already

been paid prior to the transfer or the property was party of a bankruptcy action; (3) liens had

expired prior to the execution of the Agreements or the liens were being paid in installments by a

property owner prior to execution so the total was reduced; (4) liens were not properly handled by

BCMG and/or LienClear prior to transfer, or (5) some liens were never transferred at all.  (*Id.*

¶¶ 40–44, 46).  REI allegedly knew of these problems prior to the sale to REI.  (*Id.* ¶ 47).

Following the discovery of problems with the Ohio Liens, REI contacted McOsker, who

informed REI that he would approach the seller and work out a refund for the problematic liens

and promised "that REI would get its attorney's fee back."  (*Id.* ¶ 50).  McOsker stated that the

seller was unable to provide a refund, but could transfer additional tax liens.  (*Id.* ¶ 51).  "On or

about October 25, 2016, LienClear and LienClear0001 proposed to enter into a second Tax Lien

and Purchase Agreement" under which "LienClear0001 would provide to REI additional,

replacement tax liens."  (*Id.* ¶ 52).  Plaintiff, "at significant cost, researched certain of the proposed

Replacement Tax Liens and discovered that the Replacement Tax Liens were riddled with the

same types of problems as the original Ohio Liens."  (*Id.* ¶ 54).  The "Proposed Replacement Lien

Agreement" was never executed.  (*Id.* ¶ 55).  McOsker "continually assured REI that he would remedy all problems and 'make it right' with REI," but later stated "that REI would have to sue Defendants to obtain any recovery against Defendants."  (*Id.* ¶¶ 55–56).

Moreover, LienClear and Donald Byrne "failed to review any of the Ohio Liens to determine if any were not able to be transferred or were otherwise defective," "failed to review any of the Ohio Liens to determine if there were defects, deficiencies, or other issues that impeded or precluded LienClear or Byrne from providing any or all of the Services under the Ohio Servicing Agreement, including the identification of Ohio Excluded Liens," and if such review did occur, "intentionally did not inform REI that any Ohio Liens were defective or should be categorized as Ohio Excluded Liens."  (*Id.* ¶¶ 65–67).

B. **Connecticut Tax Liens**

In February of 2015, Friedman, McOsker and Byrne approached REI about purchasing two portfolios of tax liens issued by the cities of Hartford, Bridgeport, and West Haven in Connecticut. (*Id.* ¶ 69).  LienClear0001, LienClear0002, BFNH, McOsker, Byrne, Friedman, and Optimum had acted in concert to purchase rights to these liens from the original owner, and had done so "for the express purpose of 'flipping' the liens to REI for *full redemptive value* even though there were significant problems with the liens that negatively affected their value, which were known to" Defendants.  (*Id.*).

1. First Connecticut Liens

On February 19, 2015, Optimum and REI entered into a Tax Lien Purchase and Sale Agreement ("the First Connecticut (Optimum) Agreement").  (*Id.* ¶ 70, Ex. F).  Under the First Connecticut (Optimum) Agreement, Plaintiff agreed to purchase one of the portfolios of Connecticut tax liens ("the First Connecticut Liens") for $3,309,109.30.  (*Id.* ¶ 70).  Although the

First Connecticut (Optimum) Agreement identifies Optimum as the "Seller," allegedly it was BFNH that received payment in the amount of $3,912,852.35.[3] (*Id.* ¶ 70, Ex. E).

For the pending motion, the relevant provisions of the First Connecticut (Optimum) Agreement state:

> This Tax Lien Purchase Agreement (this "Agreement") is entered into as of February 19, 2015 by and between Optimum Asset Management, LLC ("Optimum" the "Assignor" and "Servicer"), and Neff Companies, LLC dba REI Holdings, a limited liability company organized under the laws of the State of Utah (the "Assignee" and "Buyer").
>
> *   *   *
>
> 8. <u>Buyer Warranties and Representations.</u> Buyer makes the following warranties and representations as to the Assignor and their respective successors and assigns . . .
>
> (vi)    The Buyer is a sophisticated investor, has knowledge and experience in financial and business matters that enable it to evaluate the merits and risks of the transaction contemplated by this Agreement, and its decision to purchase the Tax Liens is based upon the Buyer's own independent evaluation of the Tax Liens and the related Tax Lien Documents. The Buyer acknowledges and agrees that the Assignor has not and does not represent, warrant or covenant the nature, accuracy, completeness, enforceability or validity of any of the Tax Liens or Tax Lien Documents, or any other information, data, analysis and/or correspondence, if any, which is or may have been provided to the Buyer or which is to be sold, transferred, assigned and conveyed to the Buyer. In entering into this Agreement, the Buyer has not in any way relied upon any oral or written information from the Assignor, of any of the Assignor's employees, affiliates, agents or representatives, other than the representations and warranties of the Assignor specifically provided in Sections 5 and 6 hereof. The Buyer further acknowledges that neither the Assignor nor employees, affiliates, agents or representatives of the Assignor were authorized to make, and that the Buyer has not relied upon, any statements or representations other than those specifically contained in Sections 5 and 6 hereof[.]

---

[3]    Plaintiff alleges that the discrepancy between the price listed in the First Connecticut (Optimum) Agreement and the actual purchase price is due to "the addition of more liens to the purchased portfolio, plus attorneys' fees."  (D.I. 36 at 17 n.2).

\*    \*    \*

> 15 <u>Entire Agreement; Amendments</u>. This Agreement contains the entire agreement between the parties concerning the sale and purchase of the Tax Liens, and merges and extinguishes all prior agreements, understandings and negotiations, and no amendments or modifications hereof shall be valid unless they are in writing and signed by all of the parties hereto.

(D.I. 36, Ex. F).  Optimum allegedly did not provide REI with appropriate records and documents, did not timely obtain consent of the Connecticut municipalities to transfer the First Connecticut Liens, and did not possess title to the First Connecticut Liens at the time of sale.  (*Id.* ¶¶ 72, 74, 76).  Further, "Friedman, the principal of Optimum, knew that there were significant problems with the First Connecticut Liens prior to the sale to REI [and] Friedman made sure that Optimum kept the best of the liens that were acquired rather than transfer them to REI."  (*Id.* ¶ 77).

        2.    <u>Second Connecticut Liens</u>

In July 2015, LienClear0001 and REI entered into a Tax Lien Purchase and Sale Agreement ("the Second Connecticut (LienClear0001) Agreement").  (*Id.* ¶ 78, Ex. G).  Under the Second Connecticut (LienClear0001) Agreement, Plaintiff agreed to purchase the second portfolio of Connecticut tax liens ("the Second Connecticut Liens," and together with the First Connecticut Liens, "the Connecticut Liens") for $370,298.33.  (*Id.* ¶ 78).

The Second Connecticut (LienClear0001) Agreement contains the same language in sections 4.01, 4.02, and 5.07 as the Ohio (LienClear0001) Agreement.  REI, LienClear, and LienClear0002 also executed a Servicing Agreement ("the Second Connecticut Servicing Agreement").  (D.I. 36, Ex. H).  The Second Connecticut Servicing Agreement contains the same language (quoted above) as the Ohio Servicing Agreement.

According to Plaintiff, "McOsker, Byrne and LienClear0002 concealed and failed to disclose to REI that many of the Second Connecticut Liens were not able to be transferred or were

otherwise defective" and that "McOsker and Byrne made sure that McOsker, Byrne and LienClear0001 kept the best of the liens that were acquired rather than transfer them to REI." (D.I. 36 ¶ 85).  At the time the Second Connecticut (LienClear0001) Agreement was executed, "approximately 75% of all of the Second Connecticut Liens were expired, paid off, released, or otherwise invalid or had little to no value compared to the purchase price of the Second Connecticut Liens," (*id.* ¶ 86), and BCMG, BFNH, Optimum, Friedman, McOsker, and Byrne deleted data from the Connecticut Liens to conceal material facts from REI and thereby induce REI to purchase the Connecticut Liens, (*id.* ¶ 88).  Plaintiff further alleges that "many of the Connecticut Liens already had been released or voided by the municipalities," (*id.* ¶ 89), and McOsker and Byrne had failed to disclose to REI that the Connecticut Liens lacked priority over subsequent liens issued and retained by the municipalities, (*id.*).  Instead, Friedman told REI that the Connecticut Liens would have priority over subsequent liens. (*Id.* ¶ 90).  BCMG, LienClear0001, and Optimum never provided the tax lien certificates for the Connecticut Liens transferred to REI.  (*Id.* ¶ 91).  Plaintiff was never informed that the transfer of the Connecticut Liens required the prior consent of the municipalities, (*id.* ¶ 92), that the municipalities denied payments to REI because their consent was not obtained prior to the sale of the Connecticut Liens, (*id.* ¶ 93), and that Plaintiff would need consent of the municipalities to sell the liens, (*id.* ¶ 94).

According to Plaintiff, although "McOsker has touted the ability of BCMG, LienClear and himself to provide accurate valuations of tax liens and tax lien portfolios," (*id.* ¶ 95), Friedman, McOsker, and Byrne did not provide accurate redemptive values of the Connecticut Liens to REI, (*id.* ¶ 96).  After discovering the problems with the Connecticut Liens, REI contacted McOsker, who "promised to remediate the issues and reimburse REI for the defective liens," although REI alleges that this never happened.  (*Id.* ¶ 97).  Finally, although McOsker swapped a "minimal

number" of the defective Connecticut Liens for valid liens without the consent of REI, in the spring of 2017, McOsker "told REI that REI would have to sue him and his affiliates to obtain any significant recovery from them." (*Id.* ¶ 98).

### C.   Procedural History

On September 10, 2018, REI filed a Complaint against BloxTrade, LLC, BCMG, Byrne, LienClear0001, LienClear, and McOsker. (D.I. 1). In response, on October 30, 2018, the defendants identified in the Complaint filed a motion to dismiss pursuant to Rule 12(b)(6). (D.I. 5). Plaintiff filed its Amended Complaint on November 20, 2018. (D.I. 13). On December 7, 2018, the defendants identified in the Complaint again moved to dismiss pursuant to Rule 12(b)(6). (D.I. 15). The Court granted-in-part and denied-in-part Defendants' motion. (D.I. 28).

On December 2, 2019, this case was consolidated with C.A. No. 19-1913, (D.I. 35), and thereafter, on December 20, 2019, Plaintiff filed the ACC (D.I. 36), which adds LienClear0002, Friedman, and Optimum as defendants and raises claims of: fraud in the inducement in connection with the Ohio (LienClear0001) Agreement by McOsker, Byrne, and BCMG (Count I), breach of contract in connection with the Ohio (LienClear0001) Agreement by LienClear0001 (Count II), breach of contract by LienClear (Count III), fraud in the inducement in connection with the First Connecticut (Optimum) Agreement and Second Connecticut (LienClear0001) Agreement by McOsker, Byrne, Friedman, and BCMG (Count IV), breach of contract by Optimum (Count V), breach of contract in connection with the Second Connecticut (LienClear0001) Agreement by LienClear0001 (Count VI), breach of contract by LienClear0002 (Count VII), unjust enrichment in connection with the Connecticut Liens by BFNH, LienClear0001, BCMG, McOsker, and Byrne (Count VIII), and unjust enrichment in connection with the Ohio Liens by LienClear0001, BCMG,

McOsker, and Byrne (Count IX).  (*Id.*).  On February 21, 2020, the Moving Defendants filed the present motion to dismiss pursuant to Rule 12(b)(6).  (D.I. 42).

## II.   <u>LEGAL STANDARD</u>

When presented with a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), district courts conduct a two-part analysis.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  First, the Court separates the factual and legal elements of a claim, accepting "all of the complaint's well-pleaded facts as true, but [disregarding] any legal conclusions."  *Id.* at 210–11.  Second, the Court determines "whether the facts alleged in the complaint are sufficient to show . . . a 'plausible claim for relief.'"  *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

"To survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact).'"  *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Dismissal under Rule 12(b)(6) is appropriate if a complaint does not contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at  678 (quoting *Twombly*, 550 U.S. at 570); *see also Fowler*, 578 F.3d at 210.  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  The Court is not obligated to accept as true "bald assertions" or "unsupported conclusions and unwarranted inferences."  *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997); *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997).  Instead, "[t]he complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element" of a

plaintiff's claim.   *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (internal quotation marks omitted).

## III.   DISCUSSION

### A.   Counts I and IV (Fraud in the Inducement)

In Count I, Plaintiff asserts fraud in the inducement against McOsker, Byrne, and BCMG, for the Ohio (LienClear0001) Agreement.  In Count IV, Plaintiff alleges fraud in the inducement against McOsker, Byrne, Friedman, and BCMG, for the First Connecticut (Optimum) Agreement and the Second Connecticut (LienClear0001) Agreement.  Defendants argue that Plaintiff's fraud in the inducement claims should be dismissed because they (1) are barred by enforceable integration clauses, (2) are not pleaded with sufficient particularity, (3) fail to identify a duty independent of the contract, and (4) allege statements that are mere puffery.  (D.I. 43 at 9).

#### 1.   Integration Clauses

"[A] party cannot promise, in a clear integration clause of a negotiated agreement, that it will not rely on promises and representations outside of the agreement and then shirk its own bargain in favor of a 'but we did rely on those other representations' fraudulent inducement claim.'"  *Prairie Capital III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 50 (Del. Ch. 2015) (citing *Abry Partners V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1057 (Del. Ch. 2006)).

In ruling on the Moving Defendants' prior motion to dismiss (D.I. 16), this Court focused its analysis on Section 4.01 of the Ohio (LienClear0001) Agreement and held that there were no contract provisions including explicit anti-reliance language with respect to Plaintiff, (D.I. 28 at 9).  The Moving Defendants now argue that Section 4.01 must be read in conjunction with Section 5.07 of the Ohio (LienClear0001) Agreement, which states that the agreement "contains all of the terms and conditions relating to its subject matter to which the parties agreed.   All prior

understandings of any kind are superseded by the Agreement." (D.I. 36, Ex. B at § 5.07). The Moving Defendants rely on Section 5.07 to argue that any "purported understandings of the parties were explicitly superseded." (D.I. 43 at 11).

Delaware courts have drawn a distinction between contracts with representation clauses expressed from the point of view of the seller, and those with representation clauses expressed from the point of view of the aggrieved buyer. *See FdG Logistics LLC v. A&R Logistics Holdings, Inc.*, 131 A.3d 842, 859–60 (Del. Ch.), *aff'd sub nom. A & R Logistics Holdings, Inc. v. FdG Logistics LLC*, 148 A.3d 1171 (Del. 2016) (comparing *Anvil Holding Corp. v. Iron Acquisition Co.*, No. CIV.A. 7975-VCP, 2013 WL 2249655 (Del. Ch. May 17, 2013) with *Prairie Capital*, 132 A.3d at 45). In *Anvil Holding*, the court denied a motion to dismiss a claim of fraudulent inducement because the relevant contract lacked a clause in which the buyer disclaimed reliance on extra-contractual representations, even though the contract did have an integration clause and a clause in which the seller denied extra-contractual representations. *Anvil Holding*, 2013 WL 2249655, at *8. In contrast, the court in *Prairie Capital* found that a contract that included a provision in which the buyer disclaimed extra-contractual representations and an integration clause barred buyer's recovery on claims for fraud arising out of extra-contractual fraudulent misrepresentations. *Prairie Capital*, 132 A.3d at 50–51.

Here, the Ohio (LienClear0001) Agreement does not contain explicit anti-reliance language on the part of buyer REI. Like the contract at issue in *Anvil Holding*, the Ohio (LienClear0001) Agreement contains an integration clause, (D.I. 36, Ex. B at § 5.07), and a representation clause by the seller, (*id.* at § 4.01). The provision relating to the "Buyer's Limited Representations" in the Ohio (LienClear0001) Agreement, (*id.* at § 4.02), contains nothing that can be interpreted as "a clear promise by the Buyer that it was not relying on statements made to

13

it outside of the Agreement to make its decision to enter into the Agreement." *Anvil Holding*, 2013 WL 2249655, at *8. Thus, the Court once again cannot find that Count I is barred by a clear, enforceable integration clause.

As the Moving Defendants acknowledge, the Second Connecticut (LienClear0001) Agreement and the Ohio (LienClear0001) Agreement contain the same language in their respective Sections 4.01 and 5.07. (D.I. 43 at 12). Thus, for the foregoing reasons, the Court also cannot find at this stage that Count IV, as it relates to the Second Connecticut Liens, is barred by an enforceable integration clause.

The First Connecticut (Optimum) Agreement, however, contains clear anti-reliance language from the point of view of REI. Section 8, which lays out "Buyer Warranties and Representations," states:

> In entering into this Agreement, ***the Buyer has not in any way relied upon any oral or written information*** from the Assignor, of any of the Assignor's employees, affiliates, agents or representatives, other than the representations and warranties of the Assignor specifically provided in Sections 5 and 6 hereof. The Buyer further acknowledges that neither the Assignor nor employees, affiliates, agents or representatives of the Assignor were authorized to make, and that the ***Buyer has not relied upon, any statements or representations other than those specifically contained in Sections 5 and 6 hereof***[.]

(D.I. 36, Ex. F at § 8 (emphasis added)). Like the contract at issue in *Prairie Capital*, the First Connecticut (Optimum) Agreement also contains an integration clause, (D.I. 36, Ex. F at § 15). Thus, Count IV, as it pertains to the First Connecticut Liens, is barred by an enforceable integration clause and is therefore dismissed.

### 2.     Pleading with Particularity

"Under Delaware law, the elements of fraudulent inducement and fraud are the same." *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *31

(Del. Ch. Dec. 3, 2018).  Those elements are: (1) a false representation or omission of fact that defendant had a duty to disclose; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.  *FdG Logistics*, 131 A.3d at 857; *E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 461–62 (Del. 1999).

Because Counts I and IV allege fraud, they are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.  *U.S. ex rel. Whatley v. Eastwick Coll.,* 657 F. App'x 89, 93 (3d Cir. 2016).  Under Rule 9(b), plaintiffs must "state with particularity the circumstances constituting fraud or mistake."  In other words, the complaint must provide "all of the essential factual background that would accompany 'the first paragraph of any newspaper story' – that is, the 'who, what, when, where and how' of the events at issue."  *Whatley*, 657 F. App'x at 93 (quoting *In re Rockefeller Ctr. Properties, Inc. Sec. Litig*., 311 F.3d 198, 217 (3d Cir. 2002)).  A plaintiff must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Institutional Investors Grp. v. Avaya, Inc*., 564 F.3d 242, 253 (3d Cir. 2009).  "Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time" but requires "alternative means of injecting precision and some measure of substantiation into their allegations of fraud."  *In re Rockefeller*, 311 F.3d at 216 (internal quotations omitted) (citing *In re Nice Systems, Ltd. Securities Litigation*, 135 F.Supp.2d 551, 577 (D.N.J. 2001)).

Here, Plaintiff has failed to cure the defects identified in this Court's prior dismissal of Count I – i.e., that Plaintiff had not sufficiently pleaded that the Defendants had a duty to disclose

the allegedly omitted facts in the Ohio Liens transaction.  The Court previously noted that Plaintiff had, at best, suggested "that only LienClear had a duty to disclose the allegedly omitted facts to REI."  (D.I. 28 at 11).  That remains true.  The ACC does not assert fraudulent inducement against LienClear and, beyond naming defendants in each count, repeats Count I of the prior complaint verbatim.  Indeed, in its answering brief, Plaintiff does not even argue that the ACC includes specific allegations that McOsker, Byrne, or BCMG owed a duty to disclose the allegedly omitted facts.  (*See* D.I. 45 at 16).  Thus, because Plaintiff has failed to amend the defects previously identified by this Court, Count I is dismissed with prejudice.

The Moving Defendants argue that Count IV, as it pertains to the Second Connecticut Liens, also fails to meet the pleading requirement.  They contend that nowhere in the claims "does REI plead with particularity that Defendants owed them a duty" and that Sections 4(c) and 4(e) of the Second Connecticut Servicing Agreement disprove REI's claims.  (D.I. 43 at 16).  In response, Plaintiff does not identify a duty, but argues that: (1) "[t]he tax liens purchased were worth much less than the redemptive values stated by Defendants on [Schedule 1 to the Second Connecticut (LienClear0001) Agreement]"; (2) "[s]ince McOsker and BCMG are experts in the industry, they knew or should have known that the redemptive values of the liens were inaccurate"; and (3) "McOsker, Byrne, and BCMG falsely represented the redemptive value of the tax liens on Schedule 1 . . . and as a result, induced REI to purchase the . . . Second Connecticut Liens." (D.I. 45 at 16–17).

The ACC alleges that: (1) "Friedman, McOsker and Byrne intentionally . . . failed to provide material information to REI [including] the fact that many of the Connecticut Liens already had been paid off, and thus were not worth anything and could not be re-sold"; (2) "BCMG, Friedman, McOsker and Byrne knew that the cities of West Haven, Bridgeport, and Hartford kept

16

redemptions on the Connecticut Liens and had sold many liens that had been redeemed, but McOsker and Byrne failed to disclose these facts to REI"; (3) "BCMG, Friedman, McOsker and Byrne knew that the only way for REI to recoup these redemptions was to sue the cities"; and (4) "BCMG, Friedman, McOsker and Byrne conspired to falsely represent to REI that the Connecticut Liens would generate significant profits to REI." (D.I. 36 ¶¶ 129, 131, 132, 135). As with Count I, the ACC fails to allege a duty on behalf of the individuals named.

Moreover, the Second Connecticut Servicing Agreement states that "Servicer promptly shall notify the Company of any defects, deficiencies or other issues that impede or preclude Servicer from providing any or all of the Services. Servicer represents that it has investigated the conditions necessary to provide the Services and assumes the liabilities and risks related thereto." (D.I. 36, Ex. H at § 4(e)). At most, the contract language suggests that LienClear0002, as the Servicer, had a duty to disclose the allegedly omitted information to REI, not that any individual Defendant did. As previously noted, however, Plaintiff has not asserted a fraudulent inducement claim against LienClear0002. Thus, Count IV, as it pertains to the Second Connecticut Liens, will be dismissed for want of particularity.

Having concluded that Counts I and IV should be dismissed in their entirety either for failure to plead with particularity or because of an enforceable integration clause, the Court does not reach the Moving Defendants' remaining arguments in support of dismissal.

**B.     Counts VIII and IX (Unjust Enrichment)**

In Count VIII, Plaintiff asserts unjust enrichment based on the Connecticut Liens against BFNH, LienClear0001, BCMG, McOsker, and Byrne. In Count IX, Plaintiff asserts unjust enrichment based on the Ohio Liens against LienClear0001, BCMG, McOsker, and Byrne. The Moving Defendants argue that the unjust enrichment claims must be dismissed because

(1) Plaintiff has failed to plead unjust enrichment in the alternative and (2) unjust enrichment claims cannot be asserted against McOsker and Byrne because they were not parties to the various agreements at issue.  (D.I. 43 at 19–20).

      1.      <u>Pleading in the Alternative</u>

A claim of unjust enrichment under Delaware law requires: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."  *Jackson Nat. Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393–94 (Del. Ch. 1999) (citing *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 585 (Del. Ch. 1998)).  Courts in Delaware "have consistently refused to permit a claim for unjust enrichment when the alleged wrong arises from a relationship governed by contract."  *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).  Nevertheless, "both a breach of contract and an unjust enrichment claim may survive a motion to dismiss when pled as alternative theories of recovery."  *Narrowstep, Inc. v. Onstream Media Corp.*, No. 5114-VCP, 2010 WL 5422405, at *16 (Del. Ch. Dec. 22, 2010) (citing *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, No. 3099-VCN, 2009 WL 264088, at *7 (Del. Ch. Feb. 3, 2009)).  For both claims to survive, however, the plaintiff must plead adequate factual support for each theory.  *See id.* (citing *BAE Sys.*, 2009 WL 264088, at *8).

The Moving Defendants argue that "REI's unjust enrichment claims fail as a matter of law because comprehensive, express, enforceable contracts control the parties' relationship."  (D.I. 43 at 19).  Plaintiff responds that "[i]f the Ohio and Connecticut agreements do not comprehensively govern the parties' relationship with respect to the redemptive value of the Ohio and Connecticut Liens ***as may be argued by Defendants***, then unjust enrichment is a viable alternative remedial claim with respect to Defendants' failure to provide Ohio Liens and Connecticut Liens with the

promised redemptive value." (D.I. 45 at 19) (emphasis added). Other than alluding to potential future arguments by Defendants, Plaintiff has not pleaded anything to suggest that the contracts at issue do not comprehensively govern the parties' relationship. Given that Defendants have represented that the contracts are "comprehensive, express, [and] enforceable," (D.I. 43 at 19), Plaintiff's allegations against the parties to the contracts – LienClear0001, BCMG, and BFNH – are inadequate.

Thus, Counts VIII and IX, as asserted against LienClear0001, BCMG, and BFNH, will be dismissed. If Defendants make the arguments Plaintiff alludes to, Plaintiff may seek leave to amend to assert unjust enrichment.

### 2. Assertion of Unjust Enrichment Against Nonparties to Contracts

Under Delaware law, "unjust enrichment cannot be used to circumvent basic contract principles [recognizing] that a person *not a party to [a] contract* cannot be held liable to it." *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 59 (Del. Ch. 2012) (citing *Kuroda v. SPJS Hldgs., LLC*, 971 A.2d 872, 892 (Del. Ch. Apr. 15, 2009)) (alteration in original) (emphasis in original). "However, if a nonparty to a contract knowingly facilitates prohibited activities, a claim for unjust enrichment may survive a motion to dismiss." *Lyons Ins. Agency, Inc. v. Kirtley*, No. CV N18C-09-040 CLS, 2019 WL 1244605, at *3 (Del. Super. Ct. Mar. 18, 2019). In such a case, "the relationship element necessary for unjust enrichment is a simple relationship between the plaintiff's impoverishment and defendants' enrichment." *Id.* (citing *Fitzgerald v. Cantor*, 1998 WL 326686, at *7 (Del. Ch. 1998)).

The Moving Defendants argue that because McOsker and Byrne are not parties to the agreements at issue, it is wholly inappropriate to assert an unjust enrichment claim against them.

19

(D.I. 43 at 20).  In response, Plaintiff argues that a relationship between its impoverishment and McOsker and Byrne's enrichment has been sufficiently pleaded.  (D.I. 45 at 20).  The Court agrees.

Plaintiff has adequately pleaded that McOsker and Byrne, although nonparties to the contracts, knowingly facilitated prohibited activities and that there is a relationship between REI's losses and McOsker and Byrne's enrichment.  Plaintiff has pleaded that:

- McOsker assured Plaintiff "that there was substantial value in the Ohio Liens and the properties subject thereto."  (D.I. ¶ 25).

- McOsker informed REI that he would approach the seller and work out a refund for the problematic liens and promised "that REI would get its attorney's fee back."  (*Id.* ¶ 50).

- Byrne "failed to review any of the Ohio Liens to determine if any were not able to be transferred or were otherwise defective," "failed to review any of the Ohio Liens to determine if there were defects, deficiencies, or other issues that impeded or precluded LienClear or Byrne from providing any or all of the Services under the Ohio Servicing Agreement, including the identification of Ohio Excluded Liens," and if such review did occur, "intentionally did not inform REI that any Ohio Liens were defective or should be categorized as Ohio Excluded Liens."  (*Id.* ¶¶ 65–67).

- "McOsker, Byrne and LienClear0002 concealed and failed to disclose to REI that many of the Second Connecticut Liens were not able to be transferred or were otherwise defective."  (*Id.* ¶ 85).

- "McOsker and Byrne made sure that McOsker, Byrne and LienClear0001 kept the best of the liens that were acquired rather than transfer them to REI."  (*Id.*).

- McOsker and Byrne (as well as other of the Defendants) deleted data from the Connecticut Liens to conceal material facts from REI and thereby induce REI to purchase the Connecticut Liens.  (*Id.* ¶ 88).

- McOsker and Byrne failed to disclose to REI that the Connecticut Liens lacked priority over subsequent liens issued and retained by the municipalities.  (*Id.*).

- McOsker, and Byrne did not provide accurate redemptive values of the Connecticut Liens to Plaintiff.  (*Id.* ¶ 96).

Taking these allegations as true, as required, the Court finds that Plaintiff has adequately pleaded unjust enrichment claims against McOsker and Byrne.

**IV.     <u>CONCLUSION</u>**

For the foregoing reasons, Defendant's motion to dismiss the Amended Consolidated Complaint (D.I. 36) is GRANTED-IN-PART and DENIED-IN-PART.  An appropriate order will follow.