**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| REI HOLDINGS, LLC,<br>a Utah limited liability company<br><br>            Plaintiff/Counter-Defendant,<br><br>   v.<br><br>LIENCLEAR – 0001, LLC a Delaware limited liability company, LIENCLEAR – 0002, LLC, a Delaware limited liability company, BCMG, LLC, a Puerto Rico limited liability company, LIENCLEAR, LLC, a Puerto Rico limited liability company, THOMAS MCOSKER, DONALD BYRNE, BFNH, LLC, a Delaware limited liability company, DAN FRIEDMAN and OPTIMUM ASSET MANAGEMENT, LLC, a North Carolina limited liability company,<br><br>          Defendants/Counter-Claimants. | Civil Action No. 1:18-cv-01401-MN<br><br>Jury Trial Demanded |

**DEFENDANTS LIENCLEAR – 0001, LLC, LIENCLEAR – 0002, LLC,
BCMG, LLC, LIENCLEAR, LLC, THOMAS MCOSKER, DONALD
BYRNE, AND BFNH, LLC'S ANSWER AND COUNTERCLAIMS**

Defendants/Counter-Claimants LienClear – 0001, LLC, LienClear – 0002, LLC, BCMG, LLC, LienClear, LLC, Thomas McOsker, Donald Byrne, and BFNH, LLC ("Answering Defendants"), by counsel, respond to Plaintiff/Counter-Defendant's ("Plaintiff") Consolidated Complaint (the "Complaint") as follows. For the Court's convenience, Plaintiff's allegations are set forth verbatim with Answering Defendants' responses immediately following.

Except as expressly admitted herein, Answering Defendants deny all allegations in the Complaint, including legal conclusions (which are for the Court to determine) and any allegations in headings and/or footnotes. To the extent Answering Defendants answer allegations containing terms defined in the Complaint, such answer is not an acknowledgement, admission, or adoption of any fact or characterization made by Plaintiff. In addition, to the extent Answering Defendants

refer the Court to a document referenced in the Consolidated Complaint for the complete contents thereof, they deny any allegations in the Consolidated Complaint that are inconsistent with the contents of such documents.

## INTRODUCTION

1.    Plaintiff REI is in the business of purchasing tax liens from brokers and then reselling those tax liens to investors who, in turn, monetize a tax lien by, among other ways, foreclosing on the property that is the subject of the lien, or by holding the tax lien and collecting the lien amount plus accrued interest when the tax lien is paid off by someone such as the property owner. Defendants' enterprise involves several business entities and individuals, and each is integral to the enterprise's success and is named as a defendant.

**RESPONSE**: Denied.

2.    On September 10, 2018, REI filed an action against Defendants LienClear0001, BCMG, BLOXTrade, LienClear, McOsker, and Byrne, captioned C.A. No. 18-01401-MN (the "Ohio Lien Action"). On October 8, 2019, REI filed a second action against Defendants LienClear0001, LienClear0002, BFNH, McOsker, Byrne, and Optimum, captioned C.A. No. 19-01913-CFC (the "Connecticut Lien Action").

**RESPONSE**: Admitted.

3.    Pursuant to Rule 42 of the Federal Rules of Civil Procedure, on December 12, 2019, this Court ordered that C.A. No. 19-01913-CFC shall be consolidated with C.A. No. 18-01401-MN and all papers shall be filed in C.A. No. 18-01401-MN. (C.A. 1:18-cv-01401-MN, D.I. 35).

**RESPONSE**: Admitted.

4.    This is an action to remedy (i) the fraudulent inducement and subsequent breaches of two agreements pursuant to which REI purchased from affiliates of BCMG two tax lien portfolios issued by municipalities in the State of Connecticut, for $370,298.33 and $3,912,852.35, respectively, (ii) the breach of the corresponding servicing agreement by LienClear0002, (iii) the fraudulent inducement and subsequent breach of a Tax Lien Purchase and Sale Agreement pursuant to which REI purchased from BCMG and its affiliates a tax lien portfolio held by a BCMG special purpose entity, LienClear0001, comprised of tax liens issued by counties and municipalities in the State of Ohio, for approximately $1.9 million, and (iv) the breach of certain servicing agreements by LienClear, BCMG's tax lien clearing house.

**RESPONSE**: Admitted that Plaintiff asserted claims for fraudulent inducement and breach of contract in its Consolidated Complaint ("CC"), the remainder of this sentence is denied.

## THE PARTIES

5.    REI is a Utah limited liability company with its principal place of business in the State of Utah.

**RESPONSE**: Answering Defendants are without knowledge or information sufficient to form a belief regarding the truth of the allegations of this paragraph and the same are denied.

6.    BCMG is a Puerto Rico limited liability company with its principal places of business in the United States territory of Puerto Rico and the State of New York. Upon information and belief, the members of BCMG are McOsker and Byrne. Upon information and belief, BCMG is the parent and controlling entity of Defendants LienClear, LienClear0001, and LienClear0002. McOsker is the Chief Executive Officer of BCMG.

**RESPONSE**: Admitted that BCMG is a Puerto Rico limited liability company with its principal places of business in Puerto Rico.  Admitted that McOsker is a member of BCMG.  The remaining allegations of this paragraph are denied.

7.    LienClear is a Puerto Rico limited liability company with its principal place of business in San Juan, Puerto Rico. Upon information and belief, BCMG is the sole member of LienClear.

**RESPONSE**: Admitted that LienClear is a Puerto Rico limited liability company with its principal place of business in San Juan, Puerto Rico. The remaining allegations of this paragraph are denied.

8.    LienClear0001 and LienClear0002 are two Delaware limited liability companies with their principal place of business in the State of New York. Upon information and belief, LienClear0001 and LienClear0002 are special purpose entities formed to hold and transfer certain tax lien assets on behalf of BCMG and its affiliates, including LienClear, McOsker and Byrne. Upon information and belief, BCMG is the sole member of LienClear0001 and LienClear0002.

**RESPONSE**: Admitted that LienClear0001 and LienClear0002 are two Delaware limited liability companies. The remaining allegations of this paragraph are denied.

9.    BFNH is a Delaware limited liability company. BFNH was the recipient of the funds paid by REI to purchase the Connecticut liens that Optimum sold to it. Upon information and belief, McOsker, Byrne and/or Optimum directed the payment of funds for that portfolio to BFNH.

**RESPONSE**: Answering Defendants admit the first sentence of this paragraph. The remainder of the allegation are denied.

10. McOsker is an individual who, upon information and belief, resides in the United States territory of Puerto Rico. McOsker is the Chief Executive Officer of BCMG.

**RESPONSE**: Admitted

11. Byrne is an individual who, upon information and belief resides in the State of New York. Upon information and belief, Byrne is the Director of Operations of BCMG.

**RESPONSE**: The first sentence of this paragraph is admitted. The remaining averments of this paragraph are denied.

12. Freidman is an individual who, upon information and belief resides in the State of North Carolina. Upon information and belief, Friedman is the sole member of Optimum and its principal.

**RESPONSE**: Answering Defendants are without knowledge or information sufficient to form a belief regarding the truth of the allegations of this paragraph and the same are denied.

13. Optimum is a North Carolina limited liability company with its principal place of business in North Carolina. Optimum conducts business throughout the United States.

**RESPONSE**: Answering Defendants are without knowledge or information sufficient to form a belief regarding the truth of the allegations of this paragraph and the same are denied.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the adverse parties are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.

**RESPONSE**: The allegations of this paragraph purport to state a legal conclusion to which no response is required.

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a). This action arises out of certain agreements between Plaintiff REI and Defendants LienClear0001, LienClear0002, and Optimum. Those agreements require that any action to enforce or interpret the agreements, or any dispute arising out of or relating to the agreements involving the parties thereto, be brought in

a federal or state court of competent jurisdiction in Wilmington, Delaware, with the exception of the agreement between REI and Optimum, which does not contain a forum selection provision

**RESPONSE**: The allegations of this paragraph purport to state a legal conclusion to which no response is required.

## FACTS

16.     Similar to the securitization of subprime mortgages into collateralized debt obligations that was a contributing factor in the subprime mortgage crisis, Defendants knowingly securitized, or pooled, worthless or significantly depressed assets to sell such assets with better performing assets so that Defendants could realize a substantial return on their investment in connection with the worthless or depressed assets. Many of the tax liens in the portfolios sold to REI by BCMG and the LienClear defendants were defective in several respects and BCMG and its affiliate co-conspirators in the transactions knew of, and concealed, the defects from REI. Indeed, BCMG and McOsker represent to the public, and to at least one court in the United States, that they are "experts" in evaluating and valuing tax liens.

**RESPONSE**: Denied.

17.     For example, McOsker acted as an expert witness in Snyder v. Crusader Servicing Corporation, C.A. 2007-01027, Court of Common Pleas, Montgomery County, Pennsylvania. In that action, McOsker submitted an expert report in which he touted his, BCMG's and LienClear's capabilities in the tax lien market. McOsker's "Expert Witness Report" is attached hereto as Exhibit A ("McOsker Report"). The McOsker Report states that BCMG is "a one stop shop for all tax lien things inducing [sic] Research, Software, Servicing, Education/Consulting, Origination, Investment Banking, Lending, Brokerage." Ex. A, McOsker Report, at 5. McOsker also stated in the McOsker Report that BCMG's affiliates and subsidiaries possess the tools necessary to analyze and accurately value tax liens. Ex. A, McOsker Report, at 5.

**RESPONSE**: Admitted that McOsker acted as in expert witness in *Snyder v. Crusader Servicing Corporation*, C.A. 2007-01027, Court of Common Pleas, Montgomery County, Pennsylvania. Further admitted that McOsker's Expert Witness Report is attached to the CC as Exhibit A. Defendants respectfully refer the Court to McOsker's Expert Witness Report for an accurate and complete statement of its contents. The remaining allegations of this paragraph are denied.

18.     Indeed, the McOsker Report states that BCMG's affiliates (like the LienClear entities that are defendants in this action) can provide independent valuation, lien data, portfolio summaries, market pricing and liquidity analysis. Ex. A, McOsker Report, at 11. The McOsker

Report highlights Defendants' capabilities, including access to "[d]ata feeds [that] show information on a lien and property level as recorded on books of municipalities in 50 states and Peurto Rico. Satellite imagery with parcel boundaries allows easy access to accurate, interactive photos." Ex. A, McOsker Report, at 12. The McOsker Report even highlights that Defendants can provide in-person driver inspections to "provide a more in depth look at the property." Ex. A, McOsker Report, at 12.

**RESPONSE**: The allegation of this paragraph purport to characterize provisions of McOsker's Expert Witness Report and Answering Defendants respectfully refer the Court to the same for an accurate and complete statement of its contents. The remaining allegations of this paragraph are denied.

19.     "Better data means better decisions" says McOsker in his report. Ex. A, McOsker Report, at 12.

**RESPONSE**: The allegation of this paragraph purport to characterize provisions of McOsker's Expert Witness Report and Answering Defendants respectfully refer the Court to the same for an accurate and complete statement of its contents. The remaining allegations of this paragraph are denied.

20.     The McOsker Report purports to provide a detailed valuation of 492 tax liens, and further purports to challenge the opinions of a competing expert.

**RESPONSE**: The allegation of this paragraph purport to characterize provisions of McOsker's Expert Witness Report and Answering Defendants respectfully refer the Court to the same for an accurate and complete statement of its contents. The remaining allegations of this paragraph are denied.

21.     Clear from the McOsker Report is the fact that McOsker advertises himself, BCMG, and LienClear as the leading tax lien market players, with the most sophisticated valuation tools in the industry. McOsker, on behalf of himself and the other Defendants, repeatedly conveyed to REI the level of expertise Defendants possessed in the tax lien industry.

**RESPONSE**: The allegation of this paragraph purport to characterize provisions of McOsker's Expert Witness Report and Answering Defendants respectfully refer the Court to the

same for an accurate and complete statement of its contents. The remaining allegations of this paragraph are denied.

22.     As a result of representations made to REI that were precisely the kind of representations McOsker made to the Pennsylvania court in the McOsker Report, REI was duped into purchasing tax lien portfolios that were worth significantly less than was represented to REI. McOsker and Byrne, for themselves and as agents of BCMG and the LienClear defendants, intentionally misrepresented the value of the tax lien portfolio to REI in order to induce Plaintiff to purchase the portfolio at an inflated price. The co-conspirators of this fraudulent scheme are BCMG subsidiaries or affiliates, Optimum Asset Management (with respect to the Connecticut Liens) and the individual owners (like McOsker, Byrne, and Dan Friedman) who directed the actions of their business entities. As set forth herein, Defendants conspired to defraud REI so that they could offload bad assets for a profit. Each of the Defendants are integral to the scheme and, upon information and belief, they each profited from the scheme.

**RESPONSE**: Denied**.**

23.     At multiple points in 2015, Defendants McOsker and Byrne approached and solicited REI to purchase various tax lien portfolios in Ohio and Connecticut. As set forth below, McOsker and Byrne, with respect to both Ohio and Connecticut, and Dan Friedman, with respect to Connecticut, made numerous misrepresentations and omitted material information to induce REI to purchase the tax liens. Additionally, certain other defendants breached the sale agreements that memorialized the sales of tax liens to REI, as well as the corresponding servicing agreements.

**RESPONSE**: Denied as to Answering Defendants. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph as they relate to other defendants and they are denied.

I.     The Ohio Tax Liens and Agreements

24.     In or around early November of 2015, Defendants McOsker and Byrne, on behalf of BCMG, approached REI regarding the purchase of a tax lien portfolio containing tax liens issued by certain municipalities and counties in the State of Ohio (the "Ohio Liens").

**RESPONSE**: Denied.

25.     McOsker told REI that foreclosure actions had been initiated for all of the Ohio Liens and the process was near completion to acquire the properties. McOsker further assured REI that there was substantial value in the Ohio Liens and the properties subject thereto.

**RESPONSE**: Denied

26. On November 9, 2015, McOsker informed REI that the transfers of the Ohio Liens and the acquisition of properties resulting therefrom, would be handled by Byrne at LienClear and Kristy Neff, a former employee of the State of Ohio who was working on behalf of LienClear to assist with the servicing of the Ohio Liens.

**RESPONSE**: Admitted that Donald Byrne assisted with transfers of the Ohio Liens. The remaining allegations of this paragraph are denied.

27. On November 10, 2015, Vice President of Sales and Trading for BCMG, Nick Paidas, sent certain documents to REI at the request of McOsker. One of the documents sent was a spreadsheet listing over $7.3 million in tax liens. This spreadsheet contained the details for each of the Ohio Liens.

**RESPONSE**: Admitted that Nick Paidas, sent certain documents to REI. Further admitted that one of the documents was a spreadsheet containing information regarding various tax liens. The remaining allegations of this paragraph are denied.

28. This spreadsheet was modified before the parties entered into their final contract and REI ultimately purchased approximately 383 tax liens with a claimed redemptive value of $1,893,437.07 and recoverable attorney's fees in the amount of $614,881.35.

**RESPONSE**: Admitted that REI modified the spreadsheet when it chose which liens it wished to purchase after conducting independent due diligence. The remainder of this paragraph purports to characterize portions of the spreadsheets attached to the Ohio and Connecticut Contracts and Answering Defendants respectfully refer the Court to the same for an accurate and complete statement of its contents.

29. When McOsker contacted REI about the Ohio Liens, McOsker represented that all of the attorneys' fees in connection with the underlying tax liens were incurred and paid, and that the attorney(s) working on the tax liens had completed the requisite work.

**RESPONSE**: The terms "representations" and "requisite work" are so vague such that Answering Defendants are unable to respond to the averments of this paragraph.

30. Based on the representations made by McOsker and BCMG personnel, REI agreed to purchase the Ohio tax lien portfolio, and it paid for the tax liens and the attorneys' fees incurred in connection therewith.

**RESPONSE**: Answering Defendants are without knowledge or information sufficient to form a belief regarding the truth of the allegations of this paragraph and the same are denied.

31.     On December 22, 2015, LienClear0001—a wholly-owned subsidiary of BCMG and the entity used by BCMG to effectuate the transaction—and REI entered into a Tax Lien Purchase and Sale Agreement (the "Ohio (LienClear0001) Agreement") pursuant to which REI purchased the Ohio Liens for $1,921,997.16, including brokerage, escrow and other transaction and servicer fees. A true and correct copy of the Ohio (LienClear0001) Agreement is attached hereto as Exhibit B.

**RESPONSE**: Admitted that on or about December 22, 2015, LienClear0001 and REI entered into the Ohio (LienClear001) Agreement.  Denied that LienClear0001 is a wholly-owned subsidiary of BCMG.  The remaining allegations purport to characterize provisions of the Ohio (LienClear001) Agreement and Answering Defendants respectfully refer the Court to the Ohio (LienClear001) Agreement for an accurate and complete statement of its contents.

32.     Pursuant to Section 4.01 of the Ohio (LienClear0001) Agreement, LienClear0001 represented and warranted that:

a. LienClear0001 owned the Ohio Liens,
b. LienClear0001 held good and valid title to the Ohio Liens,
c. The Ohio Liens would be transferred to REI free and clear,
d. The Ohio Liens were validly issued, and
e. LienClear0001 intended to convey legal title to all of the Ohio Liens to REI.

Ex. B, Section 4.01.

**RESPONSE**: The allegations of this paragraph purport to characterize provisions of the Ohio (LienClear0001) Agreement and Answering Defendants respectfully refer the Court to Section 4.01 of the Ohio (LienClear0001) Agreement for an accurate and complete statement of its contents.

33.     Pursuant to Section 3.02 of the agreement, the purchase price paid by REI for the Ohio Liens was to be reduced by subtracting that portion of the total purchase price that was allocable to any "Excluded Tax Liens" (hereafter "Ohio Excluded Liens"). Ex. B, Section 4.01. Ohio Excluded Liens were defined as "any Tax Liens that Seller is unable to transfer and assign to Buyer within sixty (60) days of the Effective Date, including as a result of a redemption of any Tax Lien prior to the Effective Date." Ex. B, Section 1.01.

**RESPONSE**: The allegations of this paragraph purport to characterize provisions of the Ohio (LienClear0001) Agreement and Answering Defendants respectfully refer the Court to Sections 3.02 and 4.01 of the Ohio (LienClear0001) Agreement for an accurate and complete statement of its contents.

34. LienClear0001 and LienClear were obligated to identify the Ohio Excluded Liens and reduce the purchase price paid by REI to reflect the Ohio Excluded Liens. As set forth below, LienClear's obligation to identify the Ohio Excluded Liens arose from another contract – (the "Ohio Servicing Agreement" (as discussed in detail and defined below)).

**RESPONSE**: The allegations of this paragraph purport to characterize provisions of the Ohio (LienClear0001) Agreement and Answering Defendants respectfully refer the Court to Section 3.02 of the Ohio (LienClear0001) Agreement for an accurate and complete statement of its contents.

35. Pursuant to Section 4.04 the Ohio (LienClear0001) Agreement, the parties agreed that they each would indemnify, and hold harmless, and, if requested by the other party in its sole and absolute discretion, defend the other party from and against any and all Losses[1] to the extent arising out of or related to a breach of the Ohio (LienClear0001) Agreement by such party, or any act or omission constituting gross negligence or willful misconduct on the part of such party, or any such party's breach of any applicable law.

**RESPONSE**: The allegations of this paragraph purport to characterize provisions of the Ohio (LienClear001) Agreement and Answering Defendants respectfully refer the Court to section 4.04 of the Ohio (LienClear001) Agreement for an accurate and complete statement of its contents.

36. Schedule 1 to the Ohio (LienClear0001) Agreement lists the tax lien assets sold to REI. Included on Schedule 1, among other things, is a representation of the redemptive value, or RV, of each tax lien asset being sold. Defendants represented to REI a redemptive value for each the Ohio Liens, and that the total redemptive value of the Ohio Liens was $2,508,318.42. This was knowingly false.

---

[1] Section 1.01 defines "Losses" to mean "any claims, demands, actions, causes of action, judgments, damages, recoveries, fines, penalties, interest, liabilities, fees, costs, expenses and other losses, including reasonable attorneys' fees and court costs." Ex. B, Section 1.01.

**RESPONSE**: The allegations of this paragraph purport to characterize provisions of the Ohio (LienClear0001) Agreement and Answering Defendants respectfully refer the Court to Schedule 1 of the Ohio (LienClear0001) Agreement for an accurate and complete statement of its contents. By way of further answer, Answering Defendants deny that section 4.04 triggered indemnification in the instant action.

37. McOsker has touted the ability of BCMG, LienClear and himself to provide accurate valuations of tax liens and tax lien portfolios, stating that Defendants control "enhanced analytics" and "powerful tools" to provide accurate valuations, and can access satellite imagery of properties subject to tax liens, and even facilitate in-person "driver inspections." Ex. A, McOsker Report, at 12.

**RESPONSE**: The allegations of this paragraph purport to characterize provisions of the McOsker Expert Report and Answering Defendants respectfully refer the Court to the McOsker Expert Report for an accurate and complete statement of its contents.

38. Despite having the ability to accurately value the Ohio Liens and provide accurate redemptive values, Defendants did not provide accurate redemptive values (i.e., valuations), yet falsely stated to REI that the redemptive values of the Ohio Liens were accurate.

**RESPONSE**: Denied that "redemptive values" and "valuations" are synonymous. The remaining allegations of this paragraph are denied.

A. REI Discovers Massive Problems with the Ohio Liens

39. As REI sold the Ohio Liens to its customers after the transaction described above closed, REI began to learn that many of the liens sold to it were worthless, and others were worth far less than had been represented by LienClear, LienClear0001, BCMG and McOsker.

**RESPONSE**: Answering Defendants are without knowledge or information sufficient to form a belief regarding the truth of the allegations of this paragraph and the same are denied.

40. Certain of the Ohio Liens covered properties on which the buildings had been completely demolished or condemned to be demolished without the possibility of reprieve. For example, the Ohio Liens for Parcel Nos., 443-04-027 (two liens), 109-10-095 (two liens), 643-31-003 (three liens), 128-10-029 (two liens), 138-18-066 (three liens), 137-22-076 (three liens), 138-13-110 (one lien), 108-15-031 (one lien), 546-37-132 (one lien), 110-05-054 (one lien), 016-23-095 (two liens), 108-22-042 (two liens), 108-25-117 (two liens), 108-25-120 (two liens), 110-07-

022 (two liens), 115-12-040 (two liens), 117-14-013 (two liens), 119-34-096 (three liens), 129-09-126 (one lien), 130-21-068 (three liens), 138-01-130 (two liens), 102-16-008 (two liens), 139-11-010 (two liens), and 782-24-003 (three liens) referenced in the Ohio (LienClear0001) Agreement had been demolished or were condemned to be demolished, making the corresponding lien worthless.

**RESPONSE**: Answering Defendants are without knowledge or information sufficient to

form a belief regarding the truth of the allegations of this paragraph and the same are denied.

41.     Certain Ohio Liens were non-transferable because they had been paid off by the property owner prior to the transfer of the lien to REI, or because the property was part of a bankruptcy action. For example, the Ohio Liens on Parcel Nos. 016-23-095 (two liens), 130-13-112 (three liens), 139-09-020 (two liens), 117-22-001 (two liens) and 134-09-127 (two liens), referenced in the Ohio (LienClear0001) Agreement had been paid off and there was no longer a valid lien on the property. Ohio Liens on Parcel Nos. 137-22-088 (three liens), 015-23-085 (two liens), 105-27-132 (two liens), 106-22-092 (two liens), 107-12-132 (two liens), 108-06-047 (two liens), 108-21-109 (two liens), 108-25-117 (two liens), 109-24-062 (two liens), 110-28-032 (two liens), 111-11-112 (two liens), 112-03-022 (two liens) 114-31-006 (one lien), 125-14-027 (two liens), 127-22-001 (two liens), 128-26-118 (two liens), 129-09-126 (one lien), 129-25-051 (two liens), 130-13-112 (three liens), 133-04-028 (three liens), 134-22-074 (two liens), 136-01-031 (two liens) 137-17-015 (three liens), 137-21-057 (three liens), 141-07-074 (three liens), 786-02-836C (three liens), 511-07-028 (two liens), 110-05-054 (two liens), and 129-28-071 (two liens) referenced in the Ohio (LienClear0001) Agreement were non-transferable due to bankruptcy status.

**RESPONSE**: Answering Defendants are without knowledge or information sufficient to

form a belief regarding the truth of the allegations of this paragraph and the same are denied.

42.     Certain Ohio Liens sold to REI and detailed in the Ohio (LienClear0001) Agreement had expired prior to the execution of the Ohio (LienClear0001) Agreement and were therefore worthless at the time of the transaction because a tax lien foreclosure action had not been initiated within six (6) years of the sale of the tax lien, as required by Ohio Rev. Code § 5721.33(2). For example, the Ohio Liens against Parcel Nos. 108-06-047 (two liens), 648-19-137 (one lien), and 127-15-097 (two liens) referenced in the Ohio (LienClear0001) Agreement were expired at the time they were sold to REI.

**RESPONSE**: Answering Defendants are without knowledge or information sufficient to

form a belief regarding the truth of the allegations of this paragraph and the same are denied.

43.     Certain Ohio Liens were being paid in installments by the property owner, whether by agreement or through bankruptcy payment plans that were subsequently dismissed, which presented a three-fold problem. First, because the lien amount had been reduced through payments by the property owner, the actual value of the lien at the time of the execution of the Ohio

(LienClear0001) Agreement was significantly lower than had been represented by BCMG, LienClear and LienClear0001, which meant that REI overpaid for all such liens. Second, the payments being made by the property owner post execution of the Ohio (LienClear0001) Agreement should have been paid to REI but were not. Third, the foreclosure action could not be completed where actual amounts due and owing by the property owner could not be proven. For example, the Ohio Liens on Parcel Nos. 141-09-041 (two liens), 139-09-020 (two liens), 134-19-027 (three liens), and 134-22-074 (two liens) referenced in the Ohio (LienClear0001) Agreement had been in repayment by the property owner with the seller at the time of the transaction.

**RESPONSE**: Answering Defendants are without knowledge or information sufficient to form a belief regarding the truth of the allegations of this paragraph and the same are denied.

44. Certain Ohio Liens were not properly handled by BCMG and/or LienClear prior to transfer to REI, and this fact was affirmatively misrepresented to REI. Prior to transfer to REI, McOsker represented to REI that certain attorneys' fees were incurred and paid in connection with the Ohio Liens and that the attorneys competed their work. During the course of the negotiation of the Ohio (LienClear0001) Agreement, McOsker told Brandon Neff, a principal at REI, that these attorneys' fees would be 100% collectible by REI. In reality, however, the attorneys did not finish their work. In fact, many foreclosure actions had been dismissed and new actions were required to foreclose on those Ohio Liens. Based on this representation and the corresponding understanding that it would collect these fees as a component of the redemptive value of the Ohio Liens, REI paid LienClear0001 $614,881.35 in previously incurred attorneys' fees. Under relevant Ohio law, however, only $2,500 in attorneys' fees and costs are deemed to be presumptively reasonable, and therefore, a tax lien holder cannot collect any portion of attorneys' fees and costs charged in excess of this amount unless it has proof that all legal fees incurred were necessary. These attorneys' fees are identified in the Ohio (LienClear0001) Agreement. All but six of the Ohio Liens REI purchased had incurred more than $2,500 in attorneys' fees prior to the sale. The only way REI could collect the $614,881.35 in fees and costs incurred by prior counsel would be for BCMG, LienClear and/or LienClear0001 and its affiliates to provide the requisite proof that all of the legal fees were necessary. This was not disclosed to REI at the time of sale. When REI learned of this problem after closing on the purchase of the Ohio Liens, REI requested the documentation from representatives of BCMG and LienCLear0001, including McOsker and Byrne. Despite such request, no documentation was provided to REI, and McOsker, Byrne, BCMG and LienClear0001 have refused to provide any documentation corroborating the need for the attorneys' fees paid by REI.

**RESPONSE**: Answering Defendants are without knowledge or information sufficient to form a belief regarding the truth of the allegations of this paragraph and the same are denied.

45. Further, after REI began to learn of the myriad problems with the Ohio Liens, REI was forced to engage additional legal counsel to attempt to address those problems prior to sale of the Ohio Liens by REI to the end customer.

**RESPONSE**: Answering Defendants are without knowledge or information sufficient to form a belief regarding the truth of the allegations of this paragraph and the same are denied.

46.     Certain Ohio Liens were otherwise never transferred to REI. For example, Defendants never transferred the Ohio Liens associated with Parcel Nos. 022-28-147 (two liens); 126-02-112 (four liens); 141-09-041 (two liens) 472-32-019 (four liens); 551-13-082 (two liens); 641-14-077 (three liens); 762-03-057 (two liens); and 901-31-010 (two liens).

**RESPONSE**: Answering Defendants admit certain Ohio Liens were not transferred to REI.

The remaining allegations are denied. .

47.     McOsker, Byrne, BCMG and LienClear0001 knew that there were significant problems with the Ohio Liens prior to the sale of the Ohio Liens to REI. When BCMG and the LienClear entities acquired the Ohio Liens, McOsker and Byrne made sure that BCMG and the LienClear entities kept the best of the liens that were acquired rather than transfer them to REI. In other words, McOsker, Byrne, BCMG and LienClear0001 "cherry-picked" the best of the liens for themselves and their entities and sold the remaining liens to REI. This shows that extensive review of the Ohio Liens was conducted by McOsker, Byrne, BCMG and LienClear0001, yet information from that review was concealed from REI.

**RESPONSE**: Denied.

48.     Further, as the broker and holder of the Ohio Liens prior to transfer, BCMG received notification from the relevant taxing authority, county or municipality regarding the status of the liens. In addition, with respect to the liens relating to properties on which the structure (dwelling, business, etc.) had been demolished, the county or municipality would have notified BCMG and McOsker about the demolition.

**RESPONSE**: Denied.

49.     Discovery of problems with the Ohio Liens is ongoing.

**RESPONSE**: Answering Defendants are without knowledge or information sufficient to form a belief regarding the truth of the allegations of this paragraph and the same are denied.

B.   REI Informs McOsker that the Ohio Liens are Riddled with Problems and
      McOsker, Despite Promises to Do So, Fails to Address the Problems

50.     Upon discovering the problems with the Ohio Liens, REI contacted McOsker at BCMG. McOsker told REI that he would approach the seller and work out a refund for the problematic liens. In addition, McOsker once again promised REI that REI would get its attorney's fee back that it had paid for at the time of the purchase of the Ohio Liens.

**RESPONSE**: Admitted that Brandon Neff contacted McOsker alleging that some of the Ohio Liens were problematic. Admitted that McOsker agreed to approach the seller of the allegedly problematic Ohio Liens regarding Brandon Neff's assertions. The remainder of the allegations of this paragraph are denied.

51.     McOsker, on behalf of LienClear and BCMG, claiming the seller of the liens was unable to provide a refund for the problematic liens, offered to transfer to REI additional tax liens owned by Defendants. McOsker stated that Defendants did not have the money to refund the liens.

**RESPONSE**: Admitted that the seller of the Ohio Liens refused to provide a refund for the alleged problematic liens. The remainder of the allegations of this paragraph are denied.

52.     On or about October 25, 2016, LienClear and LienClear0001 proposed to enter into a second Tax Lien Purchase and Sale Agreement (the "Proposed Replacement Lien Agreement") pursuant to which LienClear0001 would provide to REI additional, replacement tax liens for the Ohio Liens that were problematic ("Replacement Tax Liens"). A true and correct copy of the Proposed Replacement Lien Agreement is attached hereto as Exhibit C.

**RESPONSE**: Admitted that on or about October 25, 2016, LienClear and LienClear0001 proposed to enter into a second Tax Lien Purchase and Sale Agreement, attached to the CC as Exhibit C. The remaining allegations of this paragraph purport to characterize provisions of the second Tax Lien Purchase and Sale Agreement and Answering Defendants respectfully refer the Court to the same for a complete and accurate statement of its contents.

53.     REI would not be transferring problematic liens back to LienClear0001 under the Proposed Replacement Lien Agreement. LienClear0001 did not want to re-assume ownership of those liens.

**RESPONSE**: The allegations of this paragraph purport to characterize provisions of the second Tax Lien Purchase and Sale Agreement and Answering Defendants respectfully refer the Court to the same for a complete and accurate statement of its contents.

54.     REI was not equipped to easily evaluate tax liens from Ohio. Indeed, it was for this reason that REI dealt with Defendants, and, as described in more detail below, engaged LienClear to ferret out any defective Ohio Liens pursuant to LienClear's obligations under the parties' servicing agreement (discussed below). Nevertheless, REI, at significant cost, researched certain

of the proposed Replacement Tax Liens and discovered that the Replacement Tax Liens were riddled with the same types of problems as the original Ohio Liens.

**RESPONSE**: Answering Defendants are without knowledge or information sufficient to

form a belief regarding the truth of the allegations of this paragraph and the same are denied.

55.     The Proposed Replacement Lien Agreement was never executed, as REI did not want to assume ownership of additional tax liens that would cause the same problems REI was facing with the Ohio (LienClear0001) Agreement. McOsker continually assured REI that he would remedy all problems and "make it right" with REI.

**RESPONSE**: Admitted that the second Tax Lien Purchase and Sale Agreement was never

executed.  Denied that McOsker continually assured REI that he would remedy all problems and

"make it right" with REI.  Answering Defendants are without knowledge or information sufficient

to form a belief regarding the truth of the remaining allegations of this paragraph and the same are

denied.

56.     Ultimately, however, McOsker told REI that REI would have to sue Defendants to obtain any recovery against Defendants.

**RESPONSE**: Denied.

C.   LienClear Breaches the Ohio (LienClear0001) Agreement

57.      In connection with the Ohio (LienClear0001) Agreement, REI and LienClear executed a separate Ohio Servicing Agreement (the "Ohio Servicing Agreement"). A true and correct copy of the Ohio Servicing Agreement is attached hereto as Exhibit D.

**RESPONSE**: Admitted that REI and LienClear executed the Ohio Servicing Agreement

and that a true and correct copy of the same is attached to the CC as Exhibit D.

58.     As servicer, LienClear was engaged to perform, among other things, the transfer and assignment of the Ohio Liens from LienClear to REI.

**RESPONSE**: The allegations of this paragraph purport to characterize provisions of the

Ohio Servicing Agreement and Answering Defendants respectfully refer the Court to the same for

an accurate and complete statement of its contents. The remaining allegations of this paragraph are denied.

59. Pursuant to the Ohio Servicing Agreement, LienClear was obligated to perform certain tasks with respect to the transfer of the Ohio Liens from LienClear to REI. Those tasks are defined as "services" ("Ohio Services") in the Ohio Servicing Agreement, and included the obligation to review each of the Ohio Liens "to determine whether any of the Tax Liens are untransferable due to a redemption or for any other reason[.]" Ex. D, Schedule 1. LienClear was also obligated to "effectuate the assignment of each such Tax Lien to [REI]." Ex. D, Schedule 1.

**RESPONSE**: The allegations of this paragraph purport to characterize provisions of the Ohio Servicing Agreement and Answering Defendants respectfully refer the Court to the same for an accurate and complete statement of its contents.

60. LienClear was also obligated to identify the Ohio Excluded Liens under the Ohio (LienClear0001) Agreement so that such liens could be deducted from the purchase price to be paid by REI under the Ohio (LienClear0001) Agreement. Ex. D, Schedule 1.

**RESPONSE**: The allegations of this paragraph purport to characterize provisions of the Ohio Servicing Agreement and Answering Defendants respectfully refer the Court to the same for an accurate and complete statement of its contents.

61. Importantly, LienClear was required to "promptly notify [REI] of any defects, deficiencies or other issues that impede or preclude [LienClear] from providing any or all of the [Ohio] Services. [LienClear] represents that it has investigated the conditions necessary to provide the [Ohio] Services and assumes the liabilities and risks related thereto." Ex. D, Section 4.

**RESPONSE**: The allegations of this paragraph purport to characterize provisions of the Ohio Servicing Agreement and Answering Defendants respectfully refer the Court to the same for an accurate and complete statement of its contents.

62. Under the Ohio Servicing Agreement, LienClear covenanted and warranted to (among other things): (1) employ best skill, efforts and judgment in performing the Ohio Services, (2) utilize efficient business administration and supervision, and (3) perform the Ohio Services in a timely, professional and ethical manner. Ex. D, Section 4.

**RESPONSE**: The allegations of this paragraph purport to characterize provisions of the Ohio Servicing Agreement and Answering Defendants respectfully refer the Court to the same for an accurate and complete statement of its contents.

63.     Pursuant to Section 9 of the Ohio Servicing Agreement, LienClear agreed to indemnify and hold harmless REI from any and all claims, damages, fees, costs, expenses, attorneys' fees and court costs that arise out of LienClear's performance under the Ohio Servicing Agreement, breaches of any representation, warranty or covenant under the Ohio Servicing Agreement, or LienClear's negligence or misconduct. Ex. D, Section 9.

**RESPONSE**: The allegations of this paragraph purport to characterize provisions of the Ohio Servicing Agreement and Answering Defendants respectfully refer the Court to the same for an accurate and complete statement of its contents.

64.     REI paid LienClear $78,055.06 under the Ohio Servicing Agreement.

**RESPONSE**: The allegations of this paragraph purport to characterize provisions of the Ohio Servicing Agreement and Answering Defendants respectfully refer the Court to the same for an accurate and complete statement of its contents.

65.     Upon information and belief, LienClear failed to review any of the Ohio Liens to determine if any were not able to be transferred or were otherwise defective.

**RESPONSE**: Denied.

66.     Upon information and belief, LienClear failed to review any of the Ohio Liens to determine if there were defects, deficiencies or other issues that impeded or precluded LienClear from providing any or all of the Services under the Ohio Servicing Agreement, including the identification of Ohio Excluded Liens.

**RESPONSE**: Denied.

67.     If LienClear did review any of the Ohio Liens to determine if any were not able to be transferred, or if any suffered from defects, deficiencies or other issues that made any Ohio Lien an Ohio Excluded Lien, or impeded or precluded LienClear and/or Byrne from providing the Ohio Services they were obligated to provide under the Ohio Servicing Agreement, LienClear, McOsker and Byrne intentionally did not inform REI that any Ohio Liens were defective or should be categorized as Ohio Excluded Liens.

**RESPONSE**: Denied.

68.     The Ohio Servicing Agreement contains a prevailing party fee-shifting provision. Ex. D, Section 14.

**RESPONSE**: The allegations of this paragraph purport to characterize provisions of the

Ohio Servicing Agreement and Answering Defendants respectfully refer the Court to the same for

an accurate and complete statement of its contents.

## II.     The Connecticut Tax Liens and Agreements

69.     In or around February 2015, Friedman, McOsker and Byrne approached REI regarding the purchase of two portfolios of tax lien certificates issued by the cities of Hartford, Bridgeport and West Haven in Connecticut. Shortly before approaching REI, LienClear0001, LienClear0002, BFNH, McOsker, Byrne, Friedman, and Optimum, acting in concert, had agreed to purchase rights to these tax liens from the original owner of the liens, American Tax Funding, LLC ("ATF"), for approximately $400,000.00. The purchase was made for the express purpose of "flipping" the liens to REI for *full redemptive value* even though there were significant problems with the liens that negatively affected their value, which were known to LienClear0001, LienClear0002, BFNH, McOsker, Byrne, Friedman, and Optimum.

**RESPONSE**: Denied.

A. First Connecticut Liens – Optimum breaches the First Connecticut (Optimum) Agreement

70.     One of the portfolios of Connecticut tax liens was sold to REI by Optimum for $3,912,852.35 in February 2015 (the "First Connecticut Liens"). Despite Optimum being identified as the "Seller" in the relevant agreement, BFNH received $3,912,852.35 as payment for the First Connecticut Liens, which is reflected on the trade confirmation receipt for these liens.[2] *See* Ex. E. Upon information and belief, Optimum and/or its principal, Dan Friedman, directed that such payment be funneled through BFNH. On February 19, 2015, REI and Optimum entered into a Tax Lien Purchase and Servicing Agreement (the "First Connecticut (Optimum) Agreement,") pursuant to which REI agreed to purchase the First Connecticut Liens for $3,309,109.30. As stated above the actual amount paid by REI for the liens is $3,912,852.35. A true and correct copy of the First Connecticut (Optimum) Agreement is attached as Exhibit F.

**RESPONSE**: Admitted that Optimum sold REI a portfolio of tax liens.  Answering

Defendants categorically deny that BFNH received any payment for the First Connecticut Liens.

---

[2] The discrepancy in the stated purchase price in the First Connecticut (Optimum) Agreement and the amount paid to BFNH is due to the addition of more liens to the purchased portfolio, plus attorneys' fees.

The remainder of the allegations purport to characterize provisions Exhibit E to the CC and Answering Defendants respectfully refer the Court to the same for a complete and accurate statement of its contents.

71.     Pursuant to Section 2 of the First Connecticut (Optimum) Agreement, Optimum was required to deliver to REI Optimum's "servicing, financial and other files and records relating to the [First Connecticut] Liens" as well as "Tax Lien Documents." If Optimum was not able to deliver the Tax Lien Documents at the time of closing, it was required to "take all actions necessary to deliver such Tax Lien Documents as soon as possible after the Closing Date, but in no event later than 60 days after the Closing Date." If Optimum failed to deliver the Tax Lien Documents within this time period, REI had the right to require Optimum to buy back the corresponding lien.

**RESPONSE**: The allegations of this paragraph purport to characterize provisions of the First Connecticut (Optimum) Agreement and Answering Defendants respectfully refer the Court to the same for a complete and accurate statement of its contents.

72.     Optimum failed to provide to REI its servicing, financial and other records relating to the First Connecticut Liens. Optimum also failed to provide to REI the Tax Lien Documents for the First Connecticut Liens. Optimum, along with McOsker and Byrne, wanted to keep REI in the dark as much as possible regarding the true state of the First Connecticut Liens.

**RESPONSE**: The first and second sentences of this paragraph are directed toward another defendant to which no response is required. Denied that McOsker and Byrne acted in concert with Optimum.   Further denied that McOsker and Byrne kept REI "in the dark" about anything concerning the First Connecticut Liens.

73.     Pursuant to Section 5 of the First Connecticut (Optimum) Agreement, Optimum made the following representations and warranties:

a.  Optimum "has the full power, authority and legal right to hold, transfer and convey the [First Connecticut] Liens and to execute and deliver this Agreement and to perform its obligations hereunder …";
b.  "Neither the execution and delivery of this Agreement, the sale of the [First Connecticut] Liens to [REI], the consummation of the transactions contemplated hereby, nor the fulfillment of or compliance with the terms of this Agreement, will conflict with or result in a breach of … [Optimum's] organizational documents or any legal restriction or any agreement or instrument to which [Optimum] is now a party or by which it is bound…";

c. "[N]o consent of any other party and no consent, approval, authorization … is required for the execution, delivery or performance by [Optimum] of or compliance by [Optimum] with this Agreement or the sale of the [First Connecticut] Liens or the consummation of the transactions contemplated by this Agreement, or if required, such approval has been obtained prior to the Closing Date."

Ex. F.

**RESPONSE**: The allegations of this paragraph purport to characterize and quote provisions of the First Connecticut (Optimum) Agreement and Answering Defendants respectfully refer the Court to the same for a complete and accurate statement of its contents.

74.     Optimum failed to obtain the consent of the municipalities to transfer the First Connecticut Liens to REI. This was a requirement of the assignment agreements between ATF and the various municipalities. Ultimately, after the sale of the First Connecticut Liens, the municipalities agreed to the assignment of those Liens from ATF to Optimum and from Optimum to REI, which was memorialized in a Consent to Assignment of Real Property Tax Liens and two signed memorandums. These consents are dated March 24, 2015 (City of Bridgeport consent), March 26, 2017 (City of West Haven consent), and March 27, 2015 (City of Hartford consent). However, because these documents authorized the sale or transfer of the First Connecticut Liens from ATF to Optimum after the execution of the First Connecticut (Optimum) Agreement, it is clear that Optimum did not actually own the First Connecticut Liens at the time the First Connecticut (Optimum) Agreement was executed. Friedman knew that Optimum did not possess title to the First Connecticut Liens at the time they were sold to REI, yet concealed this fact from REI.

**RESPONSE**: Answering Defendants are without knowledge or information sufficient to form a belief regarding the truth of the allegations of this paragraph and the same are denied

75.     Pursuant to Section 6 of the First Connecticut (Optimum) Agreement, Optimum made the following representations and warranties as the servicer of the First Connecticut Liens:

a. "[I]mmediately prior to the purchase by [REI], [Optimum] has full right to transfer and sell the Tax Lien to [Optimum], free and clear of any encumbrance … and has full right and authority … to sell and assign each Tax Lien pursuant to this Agreement. Upon the sale of each Tax Lien, [Optimum] will have transferred and conveyed such Tax Lien to [REI] free and clear of any encumbrance …;"

b. "[T]he Tax Lien has not been redeemed, release, cancelled, satisfied, rescinded or modified. To the knowledge of the [Optimum], there are not proceedings or investigations pending or threatened asserting the invalidity of the Tax Liens."

Ex. F.

**RESPONSE**: The allegations of this paragraph purport to characterize and quote provisions of the First Connecticut (Optimum) Agreement and Answering Defendants respectfully refer the Court to the same for a complete and accurate statement of its contents.

76.     Optimum did not possess title to the First Connecticut Liens at the time of the sale to REI in violation of Section 6. Furthermore, many of the First Connecticut Liens already had been redeemed, which also constitutes a breach of Section 6 of the First Connecticut (Optimum) Agreement.

**RESPONSE**: The allegations of the first sentence of this paragraph are directed toward another Defendant to which no response is required. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of the second sentence of this paragraph and they are denied.

77.     Further, Friedman, the principal of Optimum, knew that there were significant problems with the First Connecticut Liens prior to the sale to REI. When Optimum acquired the liens, Friedman made sure that Optimum kept the best of the liens that were acquired rather than transfer them to REI. This shows that extensive review of the First Connecticut Liens was conducted by Friedman and Optimum, yet information from that review was concealed from REI.

**RESPONSE**: The allegations of this paragraph are directed toward another Defendant to which no response is required.

B. Second Connecticut Liens – LienClear0001 breaches the Second Connecticut (LienClear0001) Agreement and LienClear0002 breaches the Second Connecticut Servicing Agreement

78.     The second portfolio of Connecticut tax liens was sold to REI by LienClear0001 for $370,298.33 in July 2015 (the "Second Connecticut Liens," and together with the First Connecticut Liens, the "Connecticut Liens"). On July 6, 2015, REI entered a Tax Lien Purchase and Sale Agreement (the "Second Connecticut (LienClear0001) Agreement," Ex. G) with LienClear0001 pursuant to which REI purchased the Second Connecticut Liens for $370,298.33.

**RESPONSE**: Admitted.

79.     With respect to the Second Connecticut (LienClear0001) Agreement, pursuant to Section 4.01, LienClear0001 represented and warranted that: (i) it owned the Second Connecticut Liens, (ii) it held good and valid title to the Second Connecticut Liens, (iii) the Second Connecticut Liens would be transferred to REI free and clear, (iv) the Second Connecticut Liens were validly

issued, and (v) it intended to convey legal title to all of the Second Connecticut Liens to REI. (Ex. G.)

**RESPONSE**: The allegations of this paragraph purport to characterize and quote provisions of the Second Connecticut (LienClear0001) Agreement and Answering Defendants respectfully refer the Court to the same for a complete and accurate statement of its contents.

80.     Pursuant to Section 3.02 of the Second Connecticut (LienClear0001) Agreement, the purchase price paid by REI for the Second Connecticut Liens was to be reduced by subtracting that portion of the total purchase price that was allocable to any "Excluded Tax Liens" (hereafter, "Second Connecticut Excluded Liens".) (*Id.* at §3.02.) Second Connecticut Excluded Liens were defined as "any Tax Liens that Seller is unable to transfer and assign to Buyer within sixty (60) days of the Effective Date, including as a result of a redemption of any Tax Lien prior to the Effective Date." (*Id.* at §1.01.)

**RESPONSE**: The allegations of this paragraph purport to characterize provisions of the Second Connecticut (LienClear0001) Agreement and Answering Defendants respectfully refer the Court to the same for a complete and accurate statement of its contents.

81.     LienClear0001 and LienClear0002 were obligated to identify the Second Connecticut Excluded Liens and reduce the purchase price paid by REI to reflect the Connecticut Excluded Liens. As set forth below, the obligation to identify the Second Connecticut Excluded Liens arose from another contract – the "Connecticut Servicing Agreement" (as discussed in detail and defined below).

**RESPONSE**: The allegations of this paragraph purport to characterize provisions of the Connecticut Servicing Agreement and Answering Defendants respectfully refer the Court to the same for a complete and accurate statement of its contents.

82.     More specifically, in connection with the Second Connecticut (LienClear0001) Agreement, REI and LienClear0002 executed a servicing agreement (the "Second Connecticut Servicing Agreement," Ex. H), pursuant to which, LienClear0002 was obligated to perform certain tasks with respect to the transfer of the Second Connecticut Liens from LienClear0002 to REI. Those tasks are defined as "services" (the "Connecticut Services") in the Second Connecticut Servicing Agreement, and included the obligation to review each of the Second Connecticut Liens "to determine whether any of the Second Connecticut Liens are untransferable due to a redemption or for any other reason[.]" LienClear0002 was also obligated to "effectuate the assignment of each such Tax Lien to [REI]."

**RESPONSE**: The allegations of this paragraph purport to characterize provisions of the Second Connecticut Servicing Agreement and Answering Defendants respectfully refer the Court to the same for a complete and accurate statement of its contents.

83.     Under the Second Connecticut Servicing Agreement, LienClear0002 covenanted and warranted to: (i) employ best skill, efforts and judgment in performing the Connecticut Services under that agreement, (ii) utilize efficient business administration and supervision, and (iii) perform the Connecticut Services in a timely, professional and ethical manner.

**RESPONSE**: The allegations of this paragraph purport to characterize provisions of the Second Connecticut Servicing Agreement and Answering Defendants respectfully refer the Court to the same for a complete and accurate statement of its contents.

84.     Pursuant to Section 9 of the Second Connecticut Servicing Agreement, LienClear0002 agreed to indemnify and hold harmless REI from any and all claims, damages, fees, costs, expenses, attorneys' fees and court costs that arise out of LienClear0002's performance under the Second Connecticut Servicing Agreement, breaches of any representation, warranty or covenant under the Second Connecticut Servicing Agreement, or LienClear0002's negligence or misconduct.

**RESPONSE**: The allegations of this paragraph purport to characterize provisions of the Second Connecticut Servicing Agreement and Answering Defendants respectfully refer the Court to the same for a complete and accurate statement of its contents.

85.     McOsker, Byrne and LienClear0002 concealed and failed to disclose to REI that many of the Second Connecticut Liens were not able to be transferred or were otherwise defective. Further, much like McOsker and Byrne did with the Ohio Liens, when McOsker, Byrne and LienClear0001 acquired the Second Connecticut Liens, McOsker and Byrne made sure that McOsker, Byrne and LienClear0001 kept the best of the liens that were acquired rather than transfer them to REI – more cherry picking – and then sold the remaining defective liens to REI. This shows that extensive review of the Second Connecticut Liens was conducted by McOsker, Byrne, BCMG and LienClear0001, yet information from that review was concealed from REI and not acted upon by McOsker, Byrne, BCMG or LienClear0001.

**RESPONSE**: Denied.

C.      REI Discovers Massive Problems with the Connecticut Liens

86.     At the time the Second Connecticut (LienClear0001) Agreement was executed, McOsker and Byrne knew that the Second Connecticut Liens were of little or no value, as

approximately 75% of all of the Second Connecticut Liens were expired, paid off, released, or otherwise invalid or had little to no value compared to the purchase price of the Second Connecticut Liens.

**RESPONSE**: Denied.

87.     McOsker and Byrne concealed and failed to disclose the Connecticut Liens' lack of value to REI and instead engaged in a plan of deception with each other to induce REI to overpay for the Connecticut Liens, for servicing and for attorneys' fees, using other entities, like BFNH, to shield themselves from potential liability to REI.

**RESPONSE**: Denied.

88.     Upon information and belief, BCMG, BFNH, Optimum, Freidman, McOsker and Byrne, in concert with each other, deleted data from the Connecticut Liens to conceal material facts from REI and induce REI to purchase the Connecticut Liens. For instance, Freidman, McOsker and Byrne did not identify which of the Connecticut Liens had already been paid off, and upon information and belief, removed this information from the notes on the Connecticut Liens. This had the effect of artificially inflating the value – and therefore the purchase price – of the liens. ATF, the original purchaser of the Connecticut Liens, would have conducted significant due diligence on its purchase and would have identified liens that had been paid off to the city and/or otherwise redeemed, released or voided, and that information would be available from ATF's servicing notes, if not for Freidman's, McOsker's and Byrne's intentional actions to delete such information.

**RESPONSE**: Denied.

89.     Additionally, at the time of REI's purchase, many of the Connecticut Liens already had been released or voided by the municipalities. Friedman, McOsker and Byrne also failed to disclose to REI that the priority of older tax liens had been contractually negotiated away by ATF. That is, the Connecticut Liens that REI purchased lacked priority over any subsequent liens issued and retained by the municipalities on the properties underlying the liens.

**RESPONSE**: Answering Defendants are without knowledge or information sufficient to form a belief regarding the truth of the allegations of the first sentence of this paragraph and the same are denied. Denied that McOsker or Byrne knew of the priority of the Connecticut Lien tax lien holders.

90.     Neither Freidman, McOsker nor Byrne ever disclosed or explained to REI the existence of these contracts. Instead, Friedman, the principal of Optimum, the seller of the First Connecticut Liens, told REI the opposite: that the Connecticut Liens would have priority over subsequent liens. REI did not discover until much later that this was not the case and ATF had

contracted away the priority rights, as explained above. This created encumbrances on the Connecticut Liens, in violation of the representations and warranties in the applicable agreements.

**RESPONSE**: Answering Defendants are without knowledge or information sufficient to form a belief regarding the truth of the allegations of this paragraph and the same are denied.

91.    Neither BCMG, LienClear0001 nor Optimum ever provided the tax lien certificates for the Connecticut Liens transferred to REI.

**RESPONSE**: Denied that Answering Defendants were required to provide the tax lien certificates for the Connecticut Liens transferred to REI.

92.    REI never was informed that the municipalities needed to consent to the transfer of the Connecticut Liens to REI before the transfer occurred. When the Connecticut Liens were sold to REI, they were also assigned to REI, which included an assignment of the original purchase agreement between the municipality and ATF and all the rights and obligations contained in that agreement. One such obligation required the consent of the municipality for any subsequent assignments of the Connecticut Liens. Indeed, in the Second Connecticut (LienClear0001) Agreement, LienClear0001 represented and warranted that, among other things, they had the authority to sell the Connecticut Liens to REI.

**RESPONSE**: Answering Defendants are without knowledge or information sufficient to form a belief regarding the truth of the allegations of the allegations of first, second, and third sentences of this paragraph and the same are denied.  The remaining allegations of this paragraph purport to characterize provisions in the Second Connecticut (LienClear0001) Agreement and Answering Defendants respectfully refer the Court to the same for a complete and accurate statement of its contents.

93.    With respect to the Connecticut Liens on which payments had been made by the property owners directly to the municipalities, the municipalities denied payments to REI based on lack of privity of contract because the municipalities' consent was not obtained prior to the sale of the Connecticut Liens to REI. At the time it purchased the Connecticut Liens, it was REI's understanding that any payments made by the property owners on the Connecticut Liens to the municipalities would be remitted or forwarded to REI.

**RESPONSE**: Answering Defendants are without knowledge or information sufficient to

form a belief regarding the truth of the allegations of the allegations of this paragraph and the same

are denied.

94.     REI was also never informed that it could not resell the liens without consent of the
municipalities. Defendants knew that REI intended to resell the liens to individual customers when
the Connecticut Liens were sold to REI. REI did not learn until after the closing of the transaction
that such practice was disallowed by the municipalities, causing REI to have to refund numerous
customers and otherwise disrupting REI's business practices.

**RESPONSE**: Answering Defendants are without knowledge or information sufficient to

form a belief regarding the truth of the allegations of this paragraph and the same are denied.

95.     As detailed above, McOsker has touted the ability of BCMG, LienClear and himself
to provide accurate valuations of tax liens and tax lien portfolios, stating that Defendants control
"enhanced analytics" and "powerful tools" to provide accurate valuations, and can access satellite
imagery of properties subject to tax liens, and even facilitate in-person "driver inspections." (Ex.
A at 12.)

**RESPONSE**: The allegations of this paragraph purport to characterize provisions in the

McOsker Expert Witness Report and Answering Defendants respectfully refer the Court to the

same for a complete and accurate statement of its contents.

96.     Despite claiming to have the ability to accurately value the Connecticut Liens and
provide accurate redemptive values, Freidman, McOsker and Byrne did not do so, and instead
falsely stated to REI that the redemptive values of the Connecticut Liens were accurate.

**RESPONSE**: Denied that McOsker and Byrne provided, or were required to provide, any

valuations services in connection with the Connecticut Liens.

97.     Upon discovering the problems with the Connecticut Liens, REI contacted
McOsker at BCMG. McOsker promised to remediate the issues and reimburse REI for the
defective liens. This never happened.

**RESPONSE**: Admitted that McOsker attempted to replace the allegedly defective liens as

contemplated by the parties' contract.  The remaining allegations of this paragraph are denied.

98.     While McCosker (sic) did swap a nominal number of the defective Connecticut
Liens for valid liens, without the consent of REI (approximately $40,000 worth), ultimately, in the

spring of 2017, McOsker told REI that REI would have to sue him and his affiliates to obtain any significant recovery from them.

**RESPONSE**: Admitted that McOsker attempted to replace the allegedly defective liens as contemplated by the parties' contract. The remaining allegations of this paragraph are denied.

## <u>COUNT I</u>
### (Fraud in the Inducement against McOsker, Byrne and BCMG - Ohio (LienClear0001) Agreement)

99.     Plaintiff incorporates the allegations of each of paragraphs 1 through 98 as if fully set forth herein.

**RESPONSE**: Dismissed; no response required.

100.     BCMG, McOsker and Byrne knew that the value of the Ohio Liens was significantly less than was represented to REI at the time the Ohio (LienClear0001) Agreement was executed.

**RESPONSE**: Dismissed; no response required.

101.     BCMG, McOsker and Byrne knew that the Ohio Liens suffered from a variety of defects that made many of the liens worthless, or worth significantly less than McOsker and Byrne represented to REI.

**RESPONSE:** Dismissed; no response required.

102.     BCMG, McOsker and Byrne intentionally concealed the defects in the Ohio Liens to induce REI into entering into the Ohio (LienClear0001) Agreement.

**RESPONSE:** Dismissed; no response required**.**

103.     BCMG, McOsker and Byrne knew or should have known that REI would rely on information actually provided to REI in making its decision to purchase the Ohio Liens.

**RESPONSE:** Dismissed; no response required.

104.     BCMG, McOsker and Byrne intended for REI to overpay for the Ohio Liens.

**RESPONSE:** Dismissed; no response required.

105.     BCMG, McOsker and Byrne conspired to represent to REI that the Ohio Liens would generate significant profits to REI.

**RESPONSE:** Dismissed; no response required.

106.    REI actually and justifiably relied on the representations by McOsker and Byrne, and REI would not have purchased the Ohio Liens but for the actions and representations of McOsker and Byrne.

**RESPONSE**: Dismissed; no response required.

107.    As a result of BCMG's, McOsker's and Byrne's actions, REI has been damaged in an amount to be determined at trial.

**RESPONSE:** Dismissed; no response required.

108.    BCMG, McOsker and Byrne acted egregiously, intentionally and with reckless and wanton disregard for the rights of REI.

**RESPONSE:** Dismissed; no response required.

109.    Accordingly, REI is entitled to damages, including punitive damages, in an amount to be determined at trial.

**RESPONSE**: Dismissed; no response required.

## COUNT II
### (Breach of Contract Against LienClear0001 – Ohio (LienClear0001) Agreement)

110.    REI incorporates the allegations of paragraphs 1 through 98 as if fully set forth herein.

**RESPONSE**: Answering Defendants incorporate the allegations of each of paragraphs 1 through 98 as if fully set forth herein.

111.    Through the Ohio (LienClear0001) Agreement, LienClear0001 agreed to sell, and REI agreed to buy, the Ohio Liens.

**RESPONSE**: The allegations of this paragraph purport to characterize provisions of the Ohio (LienClear0001) Agreement and Answering Defendants respectfully refer the Court to the Ohio (LienClear0001) Agreement for an accurate and complete statement of its contents. To the extent a response is deemed required, denied.

112.    As set forth above, and as listed below, LienClear0001 breached the Ohio (LienClear0001) Agreement in multiple ways, and each such breach is an independent basis for the finding of liability.

**RESPONSE**: Denied.

113.    First, LienClear0001 was obligated to sell to REI Ohio Liens with the specific redemptive value set forth by LienClear0001 in Schedule 1 to the Ohio (LienClear0001) Agreement. As described in detail above, many of the Ohio Liens did not have the redemptive value that was stated by LienClear0001, and, thus, LienClear0001 breached the Ohio (LienClear0001) Agreement.

**RESPONSE**: Denied.

114.    Second, in connection with the sale of the Ohio Liens, pursuant to Section 4.01 of the Ohio (LienClear0001) Agreement, LienClear0001 represented and warranted that (a) it owned and held title to the Ohio Liens, (b) the Ohio Liens would be transferred to REI free and clear, (c) the Ohio Liens were validly issued, and (d) legal title to the Ohio Liens would be passed to REI.

**RESPONSE**: Denied.

115.    As set forth herein, LienClear0001 breached Section 4.01 of the Ohio (LienClear0001) Agreement by selling to REI defective Ohio Liens.

**RESPONSE**: Denied.

116.    Third, LienClear has not cured its breaches of Section 4.01 of the Ohio (LienClear0001) Agreement as required by Section 4.03 of the Ohio (LienClear0001) Agreement, and this constitutes an additional breach of the Ohio (LienClear0001) Agreement.

**RESPONSE**: Denied.

117.    Fourth, Section 3.05 of the Ohio (LienClear0001) Agreement required LienClear0001 to take actions necessary to effectuate the transactions contemplated by the Ohio (LienClear0001) Agreement, even if such actions were required to be taken after the Closing Date (as defined in the Ohio (LienClear0001) Agreement). LienClear0001 took no actions to effectuate the transfer to REI of non-defective Ohio Liens with an accurately stated redemptive value, and this constitutes an additional breach of the Ohio (LienClear0001) Agreement.

**RESPONSE**: Denied.

118.    Fifth, LienClear0001, through the use of its affiliate LienClear, was required to identify Ohio Excluded Liens and to deduct from the purchase price paid by REI amounts attributable to Ohio Excluded Liens. Despite the fact that many of the Ohio Liens were defective and met the definition of Ohio Excluded Liens, neither LienClear0001 nor its affiliates attempted to, or did, identify such defective Ohio Liens. Further, LienClear0001 did not deduct from the

purchase price paid by REI amounts attributable to Ohio Liens that should have been identified by LienClear, LienClear0001 and/or their affiliates as Ohio Excluded Liens. This constitutes an additional breach of the Ohio (LienClear0001) Agreement.

**RESPONSE**: Denied.

119.    REI is therefore entitled to recover from LienClear all damages it has sustained as a result of LienClear0001's breaches of the Ohio (LienClear0001) Agreement, in amount to be proven at trial.

**RESPONSE**: Denied.

120.    REI is further entitled to recover its attorneys' fees and costs pursuant to Section 4.04 of the Ohio (LienClear0001) Agreement.

**RESPONSE**: Denied.

<u>**COUNT III**</u>
**(Breach of Contract Against LienClear – the Ohio Servicing Agreement)**

121.    REI incorporates the allegations of paragraphs 1 through 98 as if fully set forth herein.

**RESPONSE**: Answering Defendants incorporate the allegations of each of paragraphs 1

through 98 as if fully set forth herein.

122.    Pursuant to the Ohio Servicing Agreement, LienClear was obligated to, among other things, (a) review each of the Ohio Liens to determine if any were untransferable due to a redemption or for any other reason, (b) effectuate the assignment of each Ohio Lien to REI, and (c) promptly notify REI of any defects, deficiencies or other issues with the Ohio Liens.

**RESPONSE**: Denied.

123.    LienClear was also obligated to identify Ohio Excluded Liens so that such liens could be deducted from the purchase price to be paid by REI under the Ohio (LienClear0001) Agreement.

**RESPONSE**: Denied.

124.    LienClear breached these obligations under the Ohio Servicing Agreement.

**RESPONSE**: Denied.

125.    REI is therefore entitled to recover from LienClear all damages it has sustained as a result of LienClear's breach of the Ohio Servicing Agreement, in amount to be proven at trial.

**RESPONSE**: Denied.

126.    REI is further entitled to recover its attorneys' fees and costs pursuant to Section 14 of the Ohio Servicing Agreement.

**RESPONSE**: Denied.

## COUNT IV

**(Fraud in the Inducement against McOsker, Byrne, Friedman, and BCMG - First Connecticut (Optimum) Agreement and Second Connecticut (LienClear0001) Agreement)**

127.    Plaintiff incorporates the allegations of each of paragraphs 1 through 98 as if fully set forth herein.

**RESPONSE**: Dismissed; no response required.

128.    At the time the First Connecticut (Optimum) Agreement and Second Connecticut (LienClear0001) Agreement were executed, Friedman, McOsker and Byrne knew or should have known that the value of the Connecticut Liens was significantly less than was represented to REI and that REI would not be able to collect the full redemptive value of the Connecticut Liens.

**RESPONSE**: Dismissed; no response required.

129.    Prior to the execution of the First Connecticut (Optimum) Agreement and Second Connecticut (LienClear0001) Agreement and in order to deceive REI as to the true value of the Connecticut Liens, Friedman, McOsker and Byrne intentionally concealed and removed material information from the Connecticut Liens, knew that such information was missing, or otherwise failed to provide material information to REI. This included the fact that many of the Connecticut Liens already had been paid off, and thus were not worth anything and could not be re-sold.

**RESPONSE**: Dismissed; no response required.

130.    BCMG, Friedman, McOsker and Byrne knew that the Connecticut Liens suffered from a variety of defects that made many of the liens worthless, or worth significantly less than they had represented to REI.

**RESPONSE**: Dismissed; no response required.

131.    BCMG, Friedman, McOsker and Byrne knew that the cities of West Haven, Bridgeport, and Hartford kept redemptions on the Connecticut Liens and had sold many liens that had been redeemed, but McOsker and Byrne failed to disclose these facts to REI.

**RESPONSE**: Dismissed; no response required.

132.     BCMG, Friedman, McOsker and Byrne knew that the only way for REI to recoup these redemptions was to sue the cities.

**RESPONSE**: Dismissed; no response required.

133.     BCMG, Friedman, McOsker and Byrne knew or should have known that REI would rely on the information they provided to REI in making its decision to purchase the Connecticut Liens.

**RESPONSE**: Dismissed; no response required.

134.     BCMG, Friedman, McOsker and Byrne intended for REI to overpay for the Connecticut Liens by a significant margin.

**RESPONSE**: Dismissed; no response required.

135.     BCMG, Friedman, McOsker and Byrne conspired to falsely represent to REI that the Connecticut Liens would generate significant profits to REI.

**RESPONSE**: Dismissed; no response required.

136.     REI actually and justifiably relied on the representations by Friedman, McOsker and Byrne, and REI would not have purchased the Connecticut Liens but for the actions, representations and omissions of BCMG, Friedman, McOsker and Byrne.

**RESPONSE**: Dismissed; no response required.

137.     As a result of BCMG's, Friedman, McOsker's and Byrne's actions, REI has been damaged in an amount to be determined at trial.

**RESPONSE**: Dismissed; no response required.

138.     BCMG, Friedman, McOsker and Byrne acted egregiously, intentionally, and with reckless and wanton disregard for the rights of REI.

**RESPONSE**: Dismissed; no response required.

139.     Accordingly, REI is entitled to damages, including punitive damages, in an amount to be determined at trial.

**RESPONSE**: Dismissed; no response required.

## <u>COUNT V</u>
### (Breach of Contract Against Optimum – First Connecticut (Optimum) Agreement)

140.     Plaintiff incorporates the allegations of paragraphs 1 through 98 as if fully set forth herein.

**RESPONSE**: Answering Defendants incorporate the allegations of each of paragraphs 1 through 98 as if fully set forth herein.

141.     Through the First Connecticut (Optimum) Agreement, Optimum agreed to sell, and REI agreed to buy, the First Connecticut Liens.

**RESPONSE**: The allegations of this paragraph are directed toward another defendant and no response is required. To the extent a response is deemed required, denied.

142.     As set forth above, and as listed below, Optimum breached the First Connecticut (Optimum) Agreement in multiple ways, and each such breach is an independent basis for the finding of liability.

**RESPONSE**: The allegations of this paragraph are directed toward another defendant and no response is required. To the extent a response is deemed required, denied.

143.     First, Pursuant to Section 2 of the First Connecticut (Optimum) Agreement, Optimum was required to deliver to REI Optimum's "servicing, financial and other files and records relating to the [Optimum] Liens" as well as "Tax Lien Documents" (as defined in the First Connecticut (Optimum) Agreement). If Optimum was not able to deliver the Tax Lien Documents at the time of the close of the sale, it was required to "take all actions necessary to deliver such Tax Lien Documents as soon as possible after the Closing Date, but in no event later than 60 days after the Closing Date." If Optimum failed to deliver the Tax Lien Documents within this time period, REI had the right to require Optimum to buy back the corresponding tax lien at a price equal to the purchase price for that lien.

**RESPONSE**: The allegations of this paragraph are directed toward another defendant and no response is required. To the extent a response is deemed required, denied.

144.     Optimum failed to deliver such servicing and financial information relating to the First Connecticut Liens as well as any Tax Lien Documents.

**RESPONSE**: The allegations of this paragraph are directed toward another defendant and no response is required. To the extent a response is deemed required, denied.

145.     Pursuant to Section 5 of the First Connecticut (Optimum) Agreement, Optimum made the following representations and warranties:

a. Optimum "has the full power, authority and legal right to hold, transfer and convey the [Optimum] Liens and to execute and deliver this Agreement and to perform its obligations hereunder … the consummation of the transaction contemplated hereby have been duly and validly authorized by all necessary action …";

b. "Neither the execution and delivery of this Agreement, the sale of the [Optimum] Liens to [REI], the consummation of the transactions contemplated hereby, nor the fulfillment of or compliance with the terms of this Agreement, will conflict with or result in a breach of … [Optimum's] organizational documents or any legal restriction or any agreement or instrument to which [Optimum] is now a party or by which it is bound…";

c. "[N]o consent of any other party and no consent, approval, authorization or order of, or registration or filing with, or notice to any court or governmental agency or body is required for the execution, delivery or performance by [Optimum] of or compliance by [Optimum] with this Agreement or the sale of the [Optimum] Liens or the consummation of the transactions contemplated by this Agreement, or if required, such approval has been obtained prior to the Closing Date."

**RESPONSE**: The allegations of this paragraph are directed toward another defendant and no response is required. To the extent a response is deemed required, denied.

146.    In violation of these provisions, Optimum failed to obtain the consent of the various municipalities to sell or transfer the First Connecticut Liens to REI. The various municipalities ultimately agreed to the assignment of the First Connecticut Liens from ATF to Optimum and from Optimum to REI, after the sale of the First Connecticut Liens. However, Optimum did not actually own or hold the First Connecticut Liens at the time McOsker and Byrne were soliciting REI's interest in the First Connecticut Liens and otherwise inducing it to enter the First Connecticut (Optimum) Agreement, or at the time the First Connecticut (Optimum) Agreement was executed.

**RESPONSE**: The allegations of this paragraph are directed toward another defendant and no response is required. To the extent a response is deemed required, denied.

147.    Pursuant to Section 6 of the First Connecticut (Optimum) Agreement, Optimum made the following representations and warranties as the servicer of the First Connecticut Liens:

a. "[I]mmediately prior to the purchase by [REI], [Optimum] has full right to transfer and sell the Tax Lien to [Optimum], free and clear of any encumbrance, equity, participation interest, lien, pledge, charge claim or security interest, and has full right and authority subject to no interest or participation of, or agreement with, any other party, to sell and assign each Tax Lien pursuant to this Agreement. Upon the sale of each Tax Lien, the Servicer will have transferred and conveyed such Tax Lien to [REI] free and clear of any encumbrance, equity, participation interest, lien, pledge, charge, claim or security interest;"

b. [T]he Tax Lien has not been redeemed, release, cancelled, satisfied, rescinded or modified. To the knowledge of the Servicer, there are not proceedings or investigations pending or threatened asserting the invalidity of the Tax Liens."

**RESPONSE**: The allegations of this paragraph are directed toward another defendant and no response is required. To the extent a response is deemed required, denied.

148.     Optimum did not possess title to the First Connecticut Liens at the time of the sale to REI in violation of Section 6. Furthermore, many of the First Connecticut Liens already had been redeemed. Additionally, the liens were encumbered by subsequent tax liens because the initial buyer of the First Connecticut Liens contracted away the priority of those liens, as explained above.

**RESPONSE**: The allegations of this paragraph are directed toward another defendant and no response is required. To the extent a response is deemed required, denied.

149.     As set forth herein, Optimum breached Sections 2, 5 and 6 of the First Connecticut (Optimum) Agreement by selling to REI the defective First Connecticut Liens.

**RESPONSE**: The allegations of this paragraph are directed toward another defendant and no response is required. To the extent a response is deemed required, denied.

150.     REI is therefore entitled to recover from Optimum all damages it has sustained as a result of Optimum's breaches of the First Connecticut (Optimum) Agreement, in amount to be proven at trial.

**RESPONSE**: The allegations of this paragraph are directed toward another defendant and no response is required. To the extent a response is deemed required, denied.

151.     REI is further entitled to recover its attorneys' fees and costs pursuant to Section 11 of the First Connecticut (Optimum) Agreement.

**RESPONSE**: The allegations of this paragraph are directed toward another defendant and no response is required. To the extent a response is deemed required, denied.

## COUNT VI
### (Breach of Contract against LienClear0001 – Second Connecticut (LienClear0001) Agreement)

152.     Plaintiff incorporates the allegations of paragraphs 1 through 98 as if fully set forth herein.

**RESPONSE**: Answering Defendants incorporate the allegations of each of paragraphs 1 through 98 as if fully set forth herein.

153. Through the Second Connecticut (LienClear0001) Agreement, LienClear0001 agreed to sell, and REI agreed to buy, the Second Connecticut Liens.

**RESPONSE**: The allegations of this paragraph purport to characterize provisions of the Second Connecticut (LienClear0001) Agreement and Answering Defendants respectfully refer the Court to the Second Connecticut (LienClear0001) Agreement for an accurate and complete statement of its contents. To the extent a response is deemed required, denied.

154. As set forth above, and as listed below, LienClear0001 breached the Second Connecticut (LienClear0001) Agreement in multiple ways, and each such breach is an independent basis for the finding of liability.

**RESPONSE**: Denied.

155. First, LienClear0001 was obligated to sell to REI the Second Connecticut Liens with the specific redemptive value set forth by LienClear0001 in Schedule 1 to the Second Connecticut (LienClear0001) Agreement. As described in detail above, many of the liens did not have the redemptive value that was stated by LienClear0001, and, thus, LienClear0001 breached the Second Connecticut (LienClear0001) Agreement.

**RESPONSE**: Denied.

156. Second, in connection with the sale of the Second Connecticut Liens, pursuant to Section 4.01 of the agreement, LienClear0001 represented and warranted that (i) it owned and held title to the Second Connecticut Liens, (ii) the Second Connecticut Liens would be transferred to REI free and clear, (iii) the Second Connecticut Liens were validly issued, and (iv) legal title to the Second Connecticut Liens would be passed to REI.

**RESPONSE**: Denied.

157. As set forth herein, LienClear0001 breached Section 4.01 of the agreement by selling to REI defective Second Connecticut Liens that were also encumbered by subsequent tax liens.

**RESPONSE**: Denied.

158. Third, LienClear0001 has not cured its breaches of Section 4.01 of the agreement as required by Section 4.03 of the Second Connecticut (LienClear0001) Agreement, and this constitutes an additional breach of the agreement.

**RESPONSE**: Denied.

159.    Fourth, Section 3.05 of the agreement required LienClear0001 to take actions necessary to effectuate the transactions contemplated by the Second Connecticut (LienClear0001) Agreement, even if such actions were required to be taken after the Closing Date (as defined in the Second Connecticut (LienClear0001) Agreement). LienClear0001 took no actions to effectuate the transfer to REI of non-defective Second Connecticut Liens with an accurately stated redemptive value, and this constitutes an additional breach of the agreement.

**RESPONSE**: Denied.

160.    Fifth, LienClear0001 was required to identify Second Connecticut Excluded Liens and to deduct from the purchase price paid by REI amounts attributable to Second Connecticut Excluded Liens. Despite the fact that many of the Second Connecticut Liens were defective and met the definition of Second Connecticut Excluded Liens, neither LienClear0001 nor its affiliates attempted to, or did, identify such defective Second Connecticut Liens. Further, LienClear0001 did not deduct from the purchase price paid by REI amounts attributable to Second Connecticut Liens that should have been identified by LienClear0001 and/or its affiliates as Second Connecticut Excluded Liens. This constitutes an additional breach of the Second Connecticut (LienClear0001) Agreement.

**RESPONSE**: Denied.

161.    REI is therefore entitled to recover from LienClear0001 all damages it has sustained as a result of LienClear0001's breaches of the Second Connecticut (LienClear0001) Agreement, in amount to be proven at trial.

**RESPONSE**: Denied.

162.    REI is further entitled to recover its attorneys' fees and costs pursuant to Section 4.04 of the Second Connecticut (LienClear0001) Agreement.

**RESPONSE**: Denied.

**COUNT VII**
**(Breach of Contract Against LienClear0002 – the Second Connecticut Servicing Agreement)**

163.    REI incorporates the allegations of paragraphs 1 through 98 as if fully set forth herein.

**RESPONSE**: Answering Defendants incorporate the allegations of each of paragraphs 1 through 98 as if fully set forth herein.

164.    Pursuant to the Second Connecticut Servicing Agreement, LienClear0002 was obligated to, among other things, (a) review each of the Second Connecticut Liens to determine if any were untransferable due to a redemption or for any other reason, (b) effectuate the assignment of each Second Connecticut Liens to REI, and (c) promptly notify REI of any defects, deficiencies or other issues with the Second Connecticut Liens.

**RESPONSE**: The allegations of this paragraph purport to characterize provisions of the

Second Connecticut Servicing Agreement and Answering Defendants respectfully refer the Court

to the Second Connecticut servicing Agreement for an accurate and complete statement of its

contents. To the extent a response is deemed required, denied.

165.    LienClear0002 was also obligated to identify Second Connecticut Excluded Liens so that such liens could be deducted from the purchase price to be paid by REI under the Second Connecticut (LienClear0001) Agreement.

**RESPONSE**: The allegations of this paragraph purport to characterize provisions of the

Second Connecticut Servicing Agreement and Answering Defendants respectfully refer the Court

to the Second Connecticut Servicing Agreement for an accurate and complete statement of its

contents. To the extent a response is deemed required, denied.

166.    LienClear0002 breached these obligations under the Second Connecticut Servicing Agreement.

**RESPONSE**: Denied.

167.    REI is therefore entitled to recover from LienClear0002 all damages it has sustained as a result of each party's breach of the Second Connecticut Servicing Agreement, in amount to be proven at trial.

**RESPONSE**: Denied.

168.    REI is further entitled to recover its attorneys' fees and costs pursuant to Section 14 of the Second Connecticut Servicing Agreement.

**RESPONSE**: Denied.

## COUNT VIII
**(In the Alternative, Unjust Enrichment against BFNH, LienClear0001, BCMG, McOsker and Byrne Regarding Connecticut Liens)**

169.     Plaintiff incorporates the allegations of paragraphs 1 through 98 as if fully set forth herein.

**RESPONSE**: Answering Defendants incorporate the allegations of each of paragraphs 1 through 98 as if fully set forth herein.

170.     REI paid over $370,000 to LienClear0001 for the purchase of the defective Second Connecticut Liens. REI paid almost $4 million to BFNH for the purchase of the defective First Connecticut Liens.

**RESPONSE**: Claims asserted against LienClear0001, BCMG, and BFNH are dismissed. Otherwise, denied.

171.     LienClear0001 and BFNH accepted the payments from REI while simultaneously knowing that the First and Second Connecticut Liens were defective in many ways.

**RESPONSE**: Claims asserted against LienClear0001, BCMG, and BFNH are dismissed. Otherwise, denied.

172.     LienClear0001, BFNH, BCMG, McOsker and Byrne are the direct or indirect recipients of the benefits and enrichment flowing from the misconduct described herein.

**RESPONSE**: Claims asserted against LienClear0001, BCMG, and BFNH are dismissed. Otherwise, denied.

173.     By selling to REI the defective First and Second Connecticut Liens, LienClear0001, BCMG, BFNH, McOsker and Byrne have been unfairly enriched and REI has suffered severe harm and has been impoverished.

**RESPONSE**: Claims asserted against LienClear0001, BCMG, and BFNH are dismissed. Otherwise, denied.

174.     It would be unconscionable for LienClear0001, BCMG, BFNH, McOsker and Byrne to be permitted to retain these benefits that were derived by improper and unlawful means, and without justification.

**RESPONSE**: Claims asserted against LienClear0001, BCMG, and BFNH are dismissed. Otherwise, denied.

175.     REI has no adequate remedy at law, and accordingly, this Court should award to REI an amount sufficient to eliminate LienClear0001's, BCMG's, BFNH's, McOsker's and Byrne's unjust enrichment.

**RESPONSE**: Claims asserted against LienClear0001, BCMG, and BFNH are dismissed. Otherwise, denied.

## COUNT IX
### (In the Alternative, Unjust Enrichment against LienClear0001, BCMG, McOsker and Byrne Regarding Ohio Liens)

176.    Plaintiff incorporates the allegations of paragraphs 1 through 98 as if fully set forth herein.

**RESPONSE**: Answering Defendants incorporate the allegations of each of paragraphs 1 through 98 as if fully set forth herein.

177.    REI paid over $1,900,000 to LienClear0001 for the purchase of the defective Ohio Liens.

**RESPONSE**: Claims asserted against LienClear0001 and BCMG are dismissed. Otherwise, denied.

178.    LienClear0001 and BCMG accepted the payments from REI while simultaneously knowing that the Ohio Liens were defective in many ways.

**RESPONSE**: Claims asserted against LienClear0001 and BCMG are dismissed. Otherwise, denied.

179.    LienClear0001, BCMG, McOsker and Byrne are the direct or indirect recipients of the benefits and enrichment flowing from the misconduct described herein.

**RESPONSE**: Claims asserted against LienClear0001 and BCMG are dismissed. Otherwise, denied.

180.    By selling to REI the defective Ohio Liens, LienClear0001, BCMG, McOsker and Byrne have been unfairly enriched and REI has suffered severe harm and has been impoverished.

**RESPONSE**: Claims asserted against LienClear0001 and BCMG are dismissed. Otherwise, denied.

181.    It would be unconscionable for LienClear0001, BCMG, McOsker and Byrne to be permitted to retain these benefits that were derived by improper and unlawful means, and without justification.

**RESPONSE**: Claims asserted against LienClear0001 and BCMG are dismissed. Otherwise, denied.

182.    REI has no adequate remedy at law, and accordingly, this Court should award to REI an amount sufficient to eliminate LienClear0001's, BCMG's, McOsker's and Byrne's unjust enrichment.

**RESPONSE**: Claims asserted against LienClear0001 and BCMG are dismissed. Otherwise, denied.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor and against Defendants, as follows:

A. Awarding Plaintiff compensatory damages in amount to be proven at trial;

B. Awarding Plaintiff punitive damages in an amount to be determined at trial;

C. Awarding Plaintiff pre- and post-judgment interest, plus costs and expenses, including reasonable attorneys' fees; and

D. Granting such other and further relief as the Court may deem just, equitable and proper.

**RESPONSE:** Answering Defendants deny that Plaintiffs are entitled to any relief related to the Complaint. To the extent that Plaintiffs' Prayer for Relief contains any allegations, Answering Defendants deny all such allegations.

## AFFIRMATIVE DEFENSES

Answering Defendants assert the following affirmative defenses and reserve the right to assert other defenses or claims when and if they become appropriate and/or available in this action. Answering Defendants currently are without knowledge or information sufficient to form a belief regarding other potential defenses that may be available to them, and expressly reserve the right to amend or supplement this Answer and defenses, as well as to assert any and all additional or alternative defenses under any applicable law or regulations, in the event that discovery reveals that such defenses are available. The statement of any defense herein does not assume the burden of proof for any issue as to which the applicable law places the burden of proof on Plaintiffs.

## FIRST AFFIRMATIVE DEFENSE

Plaintiff's Complaint fails to state a claim against Answering Defendants upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff has not suffered any damages.

## THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims and requests for relief are barred, in whole or in part, by Plaintiff's improper conduct, unclean hands, and breaches of the agreements.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, due to Plaintiff's failure to join necessary and/or indispensable parties.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff assumed the risk.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because any injuries suffered by Plaintiff were caused by an intervening and/or superseding cause(s).

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because none of the alleged acts or omissions of these answering Defendants were the proximate cause of the alleged damages sustained by Plaintiff.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the applicable statute of limitations.

## COUNTERCLAIMS

## FACTUAL BACKGROUND

1.      On December 22, 2015, LienClear0001 and REI entered into a Tax Lien Purchase and Sale Agreement (the "Ohio (LienClear0001) Agreement"). CC Ex. B.

2.      Pursuant to Section 4.02 of the Ohio (LienClear0001) Agreement, REI represented and warranted that it "is a sophisticated party that understands the Tax Liens, its investment in the Tax Liens and the risks associated therewith." CC Ex. B § 4.02(d).

3.      Pursuant to Section 4.04 of the Ohio (LienClear0001) Agreement, the parties agreed that they each would indemnify, and hold harmless, and, if requested by the other party in its sole and absolute discretion, defend the other party from and against any and all Losses[3] to the extent arising out of or related to a breach of the Ohio (LienClear0001) Agreement by such party, or any act or omission constituting gross negligence or willful misconduct on the part of such party, or any such party's breach of any applicable law.

4.      In connection with the Ohio (LienClear0001) Agreement, REI and LienClear executed a separate Ohio Servicing Agreement (the "Ohio Servicing Agreement"). CC Ex. D.

5.      The Ohio Servicing Agreement provides that the "substantially prevailing party in any action or proceeding brought to enforce or interpret this Agreement shall be awarded and receive its costs and reasonable attorney's fees." CC Ex. D § 14.

6.      On July 6, 2015, LienClear0001 and REI entered a Tax Lien Purchase and Sale Agreement (the "Second Connecticut (LienClear0001) Agreement") CC Ex. G.

---

[3] Section 1.01 defines "Losses" to mean "any claims, demands, actions, causes of action, judgments, damages, recoveries, fines, penalties, interest, liabilities, fees, costs, expenses and other losses, including reasonable attorneys' fees and court costs." Ex. B, Section 1.01.

7.      To Answering Defendant's knowledge and belief, on or around February 2015 REI engaged Connecticut attorney Edward L. Marcus and his firm, The Marcus Law Firm, (collectively, "Marcus") to act as servicer and collections attorney for certain Connecticut tax liens REI would subsequently acquire from Optimum (the "First Connecticut Liens").

8.      Pursuant to Section 4.02 of the Second Connecticut (LienClear0001) Agreement, REI represented and warranted that it "is a sophisticated party that understands the Tax Liens, its investment in the Tax Liens and the risks associated therewith." CC Ex. G § 4.02(d).

9.      Pursuant to Section 4.04 the Second Connecticut (LienClear0001) Agreement, the parties agreed that they each would indemnify, and hold harmless, and, if requested by the other party in its sole and absolute discretion, defend the other party from and against any and all Losses[4] to the extent arising out of or related to a breach of the Second Connecticut (LienClear0001) Agreement by such party, or any act or omission constituting gross negligence or willful misconduct on the part of such party, or any such party's breach of any applicable law. CC Ex. G § 4.04.

10.      The Second Connecticut (LienClear0001) Agreement designates "a federal or state court of competent jurisdiction situated in Wilmington, Delaware" as the exclusive forum to file or purse "[a]ny action to enforce or interpret this Agreement, or arising out of or relating to this Agreement involving the parties hereto."  CC Ex. G § 5.02.

11.      On June 12, 2017, REI filed an action in the United States District Court for the Central District of Utah purporting to state claims arising from the Second Connecticut

---

[4] Section 1.01 defines "Losses" to mean "any claims, demands, actions, causes of action, judgments, damages, recoveries, fines, penalties, interest, liabilities, fees, costs, expenses and other losses, including reasonable attorneys' fees and court costs." Ex. G, Section 1.01.

(LienClear0001) Agreement and the Second Connecticut Servicing Agreement (the "Utah Action").

12.     Lienclear, BCMG, BFNH, McOsker, and Byrne incurred attorneys' fees, costs, and related damages as a result of having to defend and seek the dismissal of REI's Utah Action.

13.     The Second Connecticut Servicing Agreement provides that the "substantially prevailing party in any action or proceeding brought to enforce or interpret this Agreement shall be awarded and receive its costs and reasonable attorney's fees (including those of in-house counsel." CC Ex. H § 14.

14.     REI filed the operative Consolidated Complaint in this action on December 12, 2019 alleging in pertinent part that LienClear0001 breached the Ohio (LienClear0001) Agreement and the Second Connecticut (LienClear0001) Agreement because REI failed to achieve the redemptive values of the Tax Liens. *See* CC ¶¶ 36, 96, 113, and 155.

15.     REI appears to believe that the redemptive values in the schedules to the Ohio (LienClear0001) Agreement and the Second Connecticut (LienClear0001) Agreement are "valuations" of the Tax Liens. *See* CC ¶ 38 ("Defendants did not provide accurate redemptive values (i.e., valuations"). Or further yet, that REI is guaranteed a certain profit when a tax lien is sold. *See, e.g.*, CC ¶¶ 36 and 113.

16.     Sophisticated purchasers in the tax lien industry such as REI understand that the industry is inherently volatile[5] and that the purported redemptive values of tax liens are not guarantees of the ultimate value of the tax liens.

---

[5] It is important to note that REI's Chief Executive Officer, Brandon Neff, has ample experience in volatile and high-risk investments as he has been previously sanctioned by the United States Security and Exchange Commission in Administrative Proceeding File No. 3-18619 for acting as an unregistered and unlicensed broker offering penny stocks.

17.     Sophisticated purchasers of tax liens further understand inherent risks of the distressed asset industry including that fact that not all tax liens are ultimately profitable. Furthermore, REI offers educational lectures, seminars and training to individual investors on the inherent risks associated with tax lien and tax deed investments so they should not have allowed themselves to be dissuaded by any misconceptions or misinterpretations in any information that may have been provided to them by Answering Defendants.

### COUNT I
(Breach of the Ohio (LienClear0001) Agreement)

18.     Answering Defendant incorporates the allegations of paragraphs 1 through 12 of the Counterclaims as if fully set forth herein.

19.     On December 22, 2015, LienClear0001 and REI entered into the Ohio (LienClear0001) Agreement.

20.     The Ohio (LienClear0001) Agreement is a binding and enforceable agreement between LienClear0001 and REI.

21.     Pursuant to Section 4.02 of the Ohio (LienClear0001) Agreement, REI represented and warranted that it "is a sophisticated party that understands the Tax Liens, its investment in the Tax Liens and the risks associated therewith." CC Ex. B § 4.02(d).

22.     REI breached the Ohio (LienClear0001) Agreement when it falsely represented that it is a sophisticated party that understands the tax lien industry and associated risks.

23.     Pursuant to Section 4.04 the Ohio (LienClear0001) Agreement, the parties agreed that they each would indemnify, and hold harmless, and, if requested by the other party in its sole and absolute discretion, defend the other party from and against any and all Losses to the extent arising out of or related to a breach of the Ohio (LienClear0001) Agreement by such party.

24.     Pursuant to the Ohio Servicing Agreement, REI's breach of the Ohio (LienClear0001) Agreement has caused the enforcement and/or interpretation of the Ohio Servicing Agreement.

25.     Due to REI's breach of its representations in the Ohio (LienClear0001) Agreement, LienClear0001 has been damaged in an amount to be determined at trial.

## COUNT II
(Breach of the Second Connecticut (LienClear0001) Agreement)

26.     Answering Defendant incorporates the allegations of paragraphs 1 through 10 of the Counterclaims as if fully set forth herein.

27.     On July 6, 2015, LienClear0001 and REI entered into the Second Connecticut (LienClear0001) Agreement.

28.     The Second Connecticut (LienClear0001) Agreement is a binding and enforceable agreement between LienClear0001 and REI.

29.     Pursuant to Section 4.02 of the Second Connecticut (LienClear0001) Agreement, REI represented and warranted that it "is a sophisticated party that understands the Tax Liens, its investment in the Tax Liens and the risks associated therewith." CC Ex. G § 4.02(d).

30.     REI breached the Second Connecticut (LienClear0001) Agreement when it falsely represented that it is a sophisticated party that understands the tax lien industry and associated risks.

31.     Pursuant to Section 4.04 the Second Connecticut (LienClear0001) Agreement, the parties agreed that they each would indemnify, and hold harmless, and, if requested by the other party in its sole and absolute discretion, defend the other party from and against any and all Losses to the extent arising out of or related to a breach of the Second Connecticut (LienClear0001) Agreement by such party.

32.     Due to REI's breach of its representations in the Second Connecticut (LienClear0001) Agreement, LienClear0001 has been damaged in an amount to be determined at trial.

## RELIEF REQUESTED

**WHEREFORE**, Answering Defendants respectfully requests that this Court enter judgment in Answering Defendants favor and against Plaintiff, as follows:

A.  Awarding Answering Defendants compensatory damages in amount to be proven at trial;

B.  Awarding Answering Defendants pre- and post-judgment interest, plus costs and expenses, including reasonable attorneys' fees; and

C.  Granting such other and further relief as the Court may deem just, equitable, and proper.

**COOCH AND TAYLOR, P.A.**
/s/ *Blake A. Bennett*
Blake A. Bennett (#5133)
Dean R. Roland (#6459)
The Nemours Building
1007 N. Orange St, Suite 1120
P.O. Box 1680
Wilmington, DE 19899-1680

*Attorneys for Answering Defendants*